FARMERS' & MERCHANTS' GIN CO. v. SIMMONS.　(No. 8097.) †

(Court of Civil Appeals of Texas. Ft. Worth. May 15, 1915. Rehearing Denied June 19, 1915.)

1. APPEAL AND ERROR ☞1001 — REVIEW — QUESTIONS OF FACT.

The weight of the testimony and the credibility of the witnesses is exclusively for the jury, and the appellate court will not set aside their findings where the testimony is reasonably sufficient to support the verdict.

[Ed. Note.—For other cases, see Appeal and Error, Cent. Dig. §§ 3922, 3928–3934; Dec. Dig. ☞1001.]

2. APPEAL AND ERROR ☞999 — VERDICT — CONCLUSIVENESS.

On the question of the sufficiency of the evidence to support the verdict, the appellate court must reject all evidence favorable to appellant, and consider only the facts tending to sustain the verdict, and if the verdict has been arrived at in an honest and impartial effort to reach the truth, the court cannot set it aside.

[Ed. Note.—For other cases, see Appeal and Error, Cent. Dig. §§ 3912–3921, 3923, 3924; Dec. Dig. ☞999.]

3. BAILMENT ☞31—ACTION FOR EXCESSIVE DELIVERY BY BAILEE—BURDEN OF PROOF.

In an action by a gin company to recover the value of cotton seed and lint cotton delivered to defendant in excess of what he was entitled to under his contract, and an excessive credit allowed him in settlement, the plaintiff had the burden of establishing the excessive deliveries and the excessive credit.

[Ed. Note.—For other cases, see Bailment, Cent. Dig. §§ 124–131; Dec. Dig. ☞31.]

4. BAILMENT ☞31 — ACTION FOR EXCESSIVE DELIVERY BY BAILEE—SUFFICIENCY OF EVIDENCE.

In such action, evidence held to support a verdict for defendant.

[Ed. Note.—For other cases, see Bailment, Cent. Dig. §§ 124–131; Dec. Dig. ☞31.]

Appeal from District Court, Denton County; C. F. Spencer, Judge.

Suit by the Farmers' & Merchants' Gin Com-

pany against J. T. Simmons. Judgment for defendant, and plaintiff appeals. Affirmed.

Garnett & Garnett, of Gainesville, and George M. Hopkins, of Denton, for appellant. Sullivan & Hill, Owsley & Owsley, and Robert H. Hopkins, all of Denton, for appellee.

CONNER, C. J. During the cotton season of 1910–1911, commencing about September 1, 1910, and ending about January, 1911, the appellant company was the owner of a gin at Lewisville in Denton county, and was engaged in ginning its own cotton, as well as cotton for its customers. Appellee during the same season was engaged in buying seed cotton on his own account at Lewisville, and the parties named entered into a contract, by which appellant agreed to gin for appellee all seed cotton delivered to it by him, and to deliver to him 65 pounds of cotton seed out of each 100 pounds of seed cotton so delivered at the gin, appellee agreeing to pay appellant $2.50 for each bale of lint cotton ginned for him during the season. This suit was instituted by the appellant gin company to recover of appellee the value of 101,984 pounds of cotton seed at the rate of $26 per ton, alleged to have been delivered to appellee in excess of the cotton seed he was entitled to receive under his said contract, and also to recover $1,686.20, the value of 11,833 pounds of lint cotton, the property of the appellant company, and alleged to have been wrongfully taken and converted by appellee, and also to recover of appellee $1,205.95 as the alleged balance due appellant for the ginning of 1,502 bales of cotton at the contract rate, and which it was alleged had never been paid except by a wrongful credit that had been entered upon the books of the appellant company for 96,626 pounds of cotton seed, which appellant had already delivered to the defendant. It was charged that the defendant had been enabled to receive such lint cotton and such excess cotton seed and such wrongful credit by the aid and connivance of N. S. Reedy, appellant's manager, or else by mistake. The defendant admitted the contract as alleged, but denied that he had received the lint cotton as charged, and denied that he had received more cotton seed than he was entitled to under the contract, and denied the conspiracy charged with Reedy. The defendant further specially pleaded that on the 21st day of March, 1911, a settlement had been made of all accounts existing between the parties. The case was submitted to a jury upon special issues, and the jury found that the defendant had delivered to the plaintiff's gin for ginning during the season of 1910–1911, 2,262,824 pounds of seed cotton; that the defendant received from the gin during the same season 1,374,860 pounds of cotton seed; that he got no more cotton seed from the gin than he was entitled to under the contract, and had not received the

lint cotton for the value of which plaintiff sued to recover. The proof shows that a settlement between the parties was had as alleged by the defendant, and that this settlement was made by the weights of the gin company as to lint cotton received and as to cotton seed delivered to the defendant. The proof further shows that all cotton seed received by the defendant at Lewisville was by him shipped to oil companies at Dallas, Tex., and that the weights of the cotton seed as rendered by the Dallas concerns and credited to the defendant aggregated a greater number of pounds than the books of the gin company at Lewisville had charged against him, and the jury, in answer to an interrogatory as to which weights were correct, answered that the Lewisville weights were. The proof further shows that Cunningham Bros. also operated a gin at Lewisville, during the season of 1910–1911, at which the defendant also delivered cotton under a contract by which he was to receive 65 pounds of seed for each 100 pounds of seed cotton delivered, and one of the principal contentions in the case was whether two certain cars of cotton seed (Nos. 10,136 and 12,066) containing in the aggregate 89,630 pounds came from the Cunningham gin or from the plaintiff gin, and the jury, in answer to a special interrogatory, declared that these cars came from the Cunningham Bros.' gin. Upon the return of the findings of the jury, as above indicated, the court rendered a judgment in the defendant's favor, and the plaintiff gin company appeals.

[1] It was substantially admitted on the submission that the verdict, if supported by the evidence, sustains the judgment rendered, and the only assignments of error presented to us are assignments which question the sufficiency of the evidence to sustain the several findings of the jury. It is very earnestly insisted that a number of the jury's special findings are in opposition to the undisputed evidence, or at least that the evidence so greatly preponderates against the findings that they should be set aside. Under our law, the weight of the testimony and the credibility of the witnesses is committed exclusively to the jury in cases of jury trials, and the uniform practice of our appellate courts is to refuse to set aside the jury's findings where the testimony with reasonable sufficiency supports the verdict. Moore v. Rogers, 84 Tex. 1, 19 S. W. 283.

[2] Our Supreme Court, in passing upon the question of the sufficiency of the evidence to support the verdict adopts the following rule:

"We must reject all evidence favorable to the plaintiffs in error, and consider only the facts and circumstances which tend to sustain the verdict, and if the jury, in an honest and impartial effort to arrive at the truth, might have reached the conclusion embodied in this verdict, this court cannot set it aside." Cartwright v. Canode (Sup.) 171 S. W. 696.

[3, 4] With these principles as guides, we have, as carefully as we could, examined the evidence in this case, and feel unable to say that the jury's verdict is so manifestly unsupported by the evidence as to require a reversal of the judgment on our part, particularly in view of the action of the trial court in refusing to set such verdict aside when called upon to do so by appellant's motion for a new trial herein. The most important controversy, as is perhaps apparent from what we have already said, is about the question of whether the 89,630 pounds of cotton seed, which the evidence without dispute shows that appellee received in cars Nos. 10,136 and 12,066, came from the appellant gin or from the gin of Cunningham Bros., for in the settlement between the parties to this controversy in March, 1911, these two cars of cotton seed were not charged to appellee on the gin books of the appellant company, as they should have been if in fact the cotton seed in these cars was received from appellant. The jury found that cotton seed at the time was worth $26 per ton, and if appellant's contention is to be sustained, it should have had a credit in the March settlement of something over $1,150 that was not allowed it. The evidence relied upon by appellant to sustain its contention that the jury were wrong in this finding consists of evidence showing the amount of seed cotton that appellee placed in the Cunningham gin during the season of 1910–1911, and the amount of cotton seed to which he was entitled to receive under his contract with Cunningham Bros., with certain evidence which shows that the books of Cunningham Bros.' gin give no account of the two car loads of cotton seed in question. If to the cotton seed charged against appellee by Cunningham Bros.' gin, there be added the cotton seed in the two cars mentioned, it will appear that appellee received in all from the Cunningham gin about 100 pounds of cotton seed to every 100 pounds of lint cotton that he placed in that gin, aggregating in all more than he was entitled to by substantially the number of pounds contained in the two cars. Appellee also testified that he bought no cotton seed of Cunningham Bros., nor did they give him any, and the record fails to show that Cunningham Bros. have ever demanded payment for these seeds. But appellee testified that while he had nothing to do with the loading of the cars, he could tell by the weights whether a given car came from the plaintiff gin or the Cunningham gin; that the method of shipment was for the gins to load the cars and deliver to him the bills of lading, and he testified specifically that the cars mentioned came from the Cunningham gin. In connection with this testimony the appellee exhibited a book kept by him, purporting to contain the entries of shipments of cotton seed made, which manifests the shipment of these two cars with the character "CY" indorsed opposite the entries, which the appellee testified meant that the same came from the Cunningham gin. Y. S. Reedy,.

appellant's manager at the time, also testified that he endeavored to keep the books of the appellant company correctly, and that these books showed no entries for the cars in question. As probably accounting for the failure of the books of Cunningham Bros. to show the delivery of the two cars, appellee also offered evidence tending to show that several leaves had been torn out of the books at about the place where the cars in question would have appeared, had the entries in fact ever been made. Both appellee and the manager Reedy also testified to the effect that Reedy had no interest in the transactions, and that there was no collusion between them. From this evidence as a whole we feel ourselves unable to say that the verdict of the jury, in answer to the special finding that the cars of cotton seed in controversy came from the Cunningham gin, is manifestly wrong. The mere fact that appellee received from the Cunningham gin more cotton seed than he was entitled to receive is not conclusive, nor it is conclusive that Cunningham Bros. have not charged appellee for these cars, or demanded payment therefor. The burden was upon the plaintiff (now appellant) to establish by a preponderance of the evidence that the seed in these two cars had been delivered to the defendant by it, and a failure to so prove rendered the question of how appellee otherwise got the seed wholly immaterial.

In order to show that the jury improperly found that appellee got no more lint cotton from appellant's gin than he was entitled to receive under the contract, appellant offered H. L. Montgomery, John Smith, and J. N. Gallahon, who severally testified, to the effect, that they were employed by appellant's gin during the season in question, and that on several occasions they had noticed the cotton "chute," through which lint cotton was deposited in the several bins, turn from appellant's bin into the bins of appellee, thus depositing cotton of right belonging to appellant upon and with that owned by appellee. The witnesses Montgomery and Smith both testified that on these occasions they had called the attention of Mr. Reedy, the manager, to the fact that the gin cotton was being put with Simmons' cotton. Appellant further showed that appellee's cotton averaged 32.03 pounds of lint cotton to the 100 pounds of seed cotton, and that the gin company's cotton throughout the season averaged but 30.63 pounds of lint to the 100 pounds of seed cotton, and that the general average of all the cotton ginned during the season was but 31.509 pounds per 100 pounds, thus showing, as computed, that appellee received some 11,833 pounds of lint cotton more than the general average, which at the time was worth 14¼ cents per pound, amounting in all to $1,686.20, for which appellee should have been charged in the March settlement. Appellee, however, in turn offered the witness Reedy, who specifically denied that Montgomery or Smith had called his attention to the cotton chute depositing cotton belonging to the plaintiff with that belonging to the defendant. He further testified, as hereinbefore more briefly stated that:

"I had no interest in the world in J. Simmons' business in any way. I never got anything out of his (John Simmons') business. I never consulted nor conferred with him about his business. I had nothing to do with his business in any way. * * * I never mixed anybody's cotton with another's. We had the cotton piled up in those stalls just as high as we can pile it. When it was piled up that way I used all the precaution I could to prevent Simmons and Wileys and other cotton from being mixed. I never knew of cotton getting mixed there. I heard this man Montgomery testify. Montgomery never came and told me that Wiley's cotton was being loaded into Simmons' bin. He never told me that at any time. Yes; this man 'Chessy' Smith worked there. The reason he quit—I fired him for drunkenness. Smith never called my attention to the spouts splitting the cotton between Wiley's and Simmons' stalls. I never, at any time or place, had any agreement with Simmons to help him in any way, or to do anything to help him in reference to Wiley."

Appellee also testified:

"Scott Reedy and I never talked or planned anything for my benefit or for his benefit against the interest of that gin. We never planned for his or my benefit against the gin in any way."

The witnesses C. M. Livingston, G. W. Clark, and Toll Jasper all testified to a more or less extended experience in farming and raising cotton, and that there was a difference in the yield of cotton as to the percentage of lint cotton to be obtained from 100 pounds of seed cotton. The witness Livingston testified that during the 8 years of his experience he thought his average of lint cotton would be about 33⅓ per cent. per 100 pounds. He also stated that he had sold his cotton to Mr. Simmons in 1910. George Clark testified to the same general effect, and that he made anywhere from 30 to 40 pounds of lint cotton to the 100 pounds of seed cotton, and that he also sold his cotton to Mr. Simmons in 1910. Toll Jasper testified to some 17 or 18 years' experience, and that there was a difference in the amount of lint that will turn out of cotton to 100 pounds. He attributed the difference to the kind of cotton, the grade of the land, the season, and the amount of rain; that he could tell cotton in the seed; he could tell whether one load is better than another; that any other experienced man could do the same thing; that his observation was that cotton would run from 27 pounds up to 38, occasionally 40, pounds of lint cotton to the 100 pounds of seed cotton. This witness also testified that he had run a gin for some 18 years, and that the general average, "take it through the season, was about 32 pounds." He further testified:

"As a cotton buyer, when the general average is 32, I think I can go on the square and pick my load and make it run 32½."

From this testimony as a whole we cannot say that the verdict of the jury was manifestly wrong. Possibly the cotton pur-

chased by the appellant company was of the same kind and grade as that purchased by the appellee, but there is no specific evidence that this was true. The jury possibly drew the inference that appellee was the better buyer, or had exercised greater care in buying, and that his average turnout was not so greatly abnormal as to show that appellee must have received any substantial amount of appellant's cotton, particularly in view of Reedy's testimony and also of appellee's that Reedy had no interest whatever in aiding the appellee, and that he exercised his best efforts to keep the cotton from being mixed. To say the least of it, it seems to us that, under the circumstances stated, it would be quite difficult to determine with any degree of accuracy any precise quantity of lint cotton, if any, that appellee received of appellant's cotton, to which he was not entitled. The burden of doing this was, of course, upon appellant. The assignment raising this question must accordingly be overruled.

But little more need be said further than that in the settlement hereinbefore referred to, which was made between appellee and Reedy in behalf of appellant, it was shown by the books of the appellant company that appellee's total indebtedness on the ginning account amounted to $1,344.45. From this was deducted several payments made by him and a further credit for 96,626 pounds of cotton seed at $26 per ton, which the books of the appellant company showed appellee to be entitled to, but which he had not received, leaving a balance of $138.50, for which appellee then gave his check. Appellant, accordingly, insists that it thus appears that appellee was given credit for several thousand pounds of cotton seed more than he was entitled to, even excluding the cotton seed in cars 10,136 and 12,066. The discrepancy, however, is doubtless occasioned by the difference between the weights of the appellant gin company and those of the Dallas concerns to which appellee shipped his cotton seed. Both appellee and Reedy testified to the effect that Reedy was to account for the cotton seed received by him by the gin company's weights, and there is no contention, as we understand the record, that the credit of 96,626 pounds of cotton seed was in excess of the credit to which appellee was entitled by the weights of the gin company. Appellant's contention is seemingly predicated upon the weights of the oil companies in Dallas, hereinbefore referred to, which the witness at that end of the shipments testified had been correctly made. The jury, however, have found that the gin company's weights were correct, and we do not feel able to say that the jury's finding in this respect is unsupported by the evidence. The evidence on the subject was from the witnesses Reedy and Holley, both of whom it appears weighed cotton as it came in and cotton seed as it went out, Holley being employed in the special capacity of weigher. Holley testified that it was his duty to weigh the cotton as received and the seed as it went out; that he had nothing else to do. As he weighed, he made entries upon the books. He testified: "I weighed and made the entries correctly." Mr. Reedy testified that it was the duty of Mr. Holley to weigh the cotton as it was received, and to make the book entries. He further testified:

"You will notice in the book that there will be an occasional load entered in my handwriting of cotton that came in there. That would be sometimes that I would be in the office, and he had me to weigh a load. I just weighed the load and made the entry on the book. I weighed and made the entry correctly on the book."

It thus appears, we think, that the evidence relating to the accuracy of the differing weights is merely conflicting, which committed the determination of that particular controversy to the jury.

On the whole, we conclude that the verdict of the jury must be sustained, and the judgment affirmed.