**DEGENHARDT et al. v. JOPLIN et al.\***
(No. 9728.)

(Court of Civil Appeals of Texas. Fort Worth. Feb. 11, 1922. Rehearing Denied March 11, 1922.)

**1. Wills ⊕400—Only evidence sustaining the verdict considered.**

On appeal from a judgment for contestants, in action to set aside probate of will for mental incapacity and undue influence, the judgment will be sustained upon the facts, if by rejecting all evidence favorable to the contestees and considering only the evidence sustaining the verdict, the verdict could have been reasonably reached by an unbiased jury upon the testimony; the weight of testimony and credibility of witnesses being exclusively for the jury.

**2. Wills ⊕82—Unjust wills regarded with suspicion.**

A will which is partial and unjust in its provisions, absurd, or clearly devoid of natural duty of affection, finds no hearty support in the courts, and, though not absolutely void, its

---

⊕For other cases see same topic and KEY-NUMBER in all Key-Numbered Digests and Indexes

*Writ of error dismissed for want of jurisdiction April 19, 1922.

execution will be regarded with jealousy and suspicion.

**3. Wills  ⬉⟶55(1), 166(1)—Evidence held to show mental incapacity and undue influence.**

In an action to set aside a will, evidence *held* sufficient to support findings that testatrix lacked testamentary capacity and that undue influence was exercised upon her.

Appeal from District Court, Eastland County; E. A. Hill, Judge.

Suit by Mrs. S. E. E. Joplin, joined by her husband, against Stella Caldwell Degenhardt and others. Judgment for plaintiffs, and defendants appeal. Affirmed.

D. K. Scott and Butts & Wright, all of Cisco, for appellants.

Alexander & Baldwin, of Fort Worth, for appellees.

BUCK, J. This is a suit filed by Mrs. S. E. E. Joplin, joined by her husband, to set aside the probate of a will made by her mother, Mrs. Mary E. Caldwell, September 9, 1914.

The cause was submitted to a jury on two special issues, to wit:

1. "Did Mary E. Caldwell have mental capacity, as herein defined, to execute the will introduced in evidence?"

Answer: "No."

2. "Was Mary E. Caldwell compelled to execute the will introduced in evidence by undue influence, as hereinafter defined, of Stella Caldwell Degenhardt, R. W. Caldwell, and James A. Caldwell?"

Answer: "She was unduly influenced."

Mrs. Caldwell was married twice, and Mrs. Joplin was the child of the first marriage, while Mrs. Degenhardt and R. W. Caldwell and the father of James A. Caldwell were the fruits of the second marriage. At the time of the testatrix's death, she was 75 years old. She bequeathed to R. W. Caldwell, her son, to Mrs. Stella Caldwell Degenhardt, her daughter, and to her grandson, James A. Caldwell, the west one-half of section 86, block 4, Houston & Texas Central Railway Company survey, share and share alike. This land was incumbered by a mortgage of $2,000. To her daughter, Stella C. Degenhardt, she bequeathed the residue of her property, including a home in Cisco, where the testatrix lived at the time of her death. The will provided that, if Mrs. Degenhardt should die without issue, the property devised to her should go to James A. Caldwell, and, likewise, if James A. Caldwell should die without issue, the property willed to him should go to Mrs. Degenhardt. She appointed Mrs. Degenhardt independent executrix to execute her will

James A. Caldwell was about 19 years old at the time of his grandmother's death, and had lived with her since he was 6 years old.

Mrs. Caldwell was stricken with paralysis on August 12, 1914, and died on October 22d, thereafter. At the time she was stricken, none of her children were at home; James being the only one present. Her son, R. W. Caldwell, who lived in Lawton, Okl., arrived at Cisco on August 14, and remained 2 weeks. He then left Cisco and returned about 3 days before his mother's death. Mr. and Mrs. Degenhardt lived at Mrs. Caldwell's, but Mrs. Degenhardt was absent in New York at the time Mrs. Caldwell was stricken, but she came home immediately. Mrs. Joplin lived at San Angelo. It appears that she had lived with her mother and stepfather for 14 years in Cisco; that during part of the time, at least, she was working, and gave to her stepfather a part of her earnings to invest in a home, with the expectation on her part, and the promise on the part of Mr. Caldwell, to have such loan returned to her. She had not visited her mother for a number of years, but her mother had visited her at San Angelo, and she testified that the relationship between them had always been affectionate and amicable.

Soon after Mrs. Caldwell was stricken with paralysis, R. W. Caldwell telephoned to Mrs. Joplin at San Angelo, telling her that her mother was quite sick, and that he would keep her posted as to her condition. She immediately came to Cisco, reaching there early in the morning. When she reached her mother's home, James A. Caldwell met her at the door. He said, "Hello, Aunt Ella," and Mrs. Joplin said, "I came to see my mother." James then replied that his grandmother was not receiving visitors, and Mrs. Joplin said she did not count herself a visitor; that she counted herself one of the children. She then called for her brother R. W. Caldwell, and when he came to the door he said that the doctor would not let any one go in where his mother was except those who had been present before. Mr. Degenhardt said about the same thing. Mrs. Degenhardt did not come to the door or see her sister. Upon receiving the statements made by her brother, nephew, and brother-in-law, Mrs. Joplin, after waiting awhile on the porch, as she said to get her strength, went to the home of a niece near by. While there she again asked her brother, R. W. Caldwell, for permission to see her mother, and he again stated that she could not see her. After remaining a few days in Cisco, she returned to her home in San Angelo.

James Caldwell, R. W. Caldwell, Mrs. Caldwell's pastor, and her lawyer who drew the will, and several of her neighbors, testified that Mrs. Caldwell was a woman of more than average mentality, and that during her last illness, on or about the day when the will was executed, they visited her and talked with her, and in their opinion she was

of sound mind and in possession of all of her faculties, and that she discussed current topics in a most intelligent manner. Her attorney stated that someone called him on September 9, 1914, to go down to Mrs. Caldwell's to write a will; that he went, and found no one in the room, though the doctor was just coming out; that Mrs. Caldwell gave him a description of all of her property, told him how she wanted the property to go and that she asked him if it was necessary for her to make a bequest to her daughter Mrs. Joplin; That he told her, no, but that it might be well to put her name in the will, and he suggested that one dollar might be sufficient to show that she had not forgotten her daughter; that Mrs. Caldwell then replied, "put in $5." The will had this clause:

"To my daughter Mrs. Ella Joplin I give, devise and bequeath the sum of five ($5.00) dollars to be paid to her by my executrix hereinafter appointed. My reason for not making a larger and more substantial bequest to my said daughter Mrs. Ella Joplin is, that all the property I own, or in which I have any interest, is community property of myself and my deceased husband, W. T. Caldwell, all of which was accumulated through his efforts, industry and economy, and I feel that justice demands it should go to, and be received, taken, held and enjoyed by his children and their descendants."

With reference to this clause her attorney testified as follows:

"And when it came to that property being community property and had not been settled and had been accumulated through the economy and thrift of her husband Mr. Caldwell, and I insisted that that not go in, and she said she wanted that to go in there as explaining why she left that to Mr. Caldwell's children and to his grandchildren."

[1] It is our duty, under well-recognized principles, to sustain the judgment upon the facts, if by rejecting all evidence favorable to the contestees, appellants here, and considering only the evidence sustaining the verdict, the verdict rendered could have been reasonably reached by an unbiased jury upon the testimony. Cartwright v. Canode, 106 Tex. 502, 171 S. W. 696; Fort Worth & D. C. Ry. Co. v. Decatur Cottonseed Oil Co. (Tex. Civ. App.) 193 S. W. 392. The weight of the testimony and the credibility of the witnesses is exclusively for the jury, and the appellate court will not set aside their findings where the testimony is reasonably sufficient to support the verdict. Farmers' & Merchants' Gin Co. v. Simmons (Tex. Civ. App.) 178 S. W. 621; Moore v. Rogers, 84 Tex. 1, 19 S. W. 283.

[2] A will which is partial and unjust in its provisions, absurd, or clearly devoid of natural duty or affection, finds no hearty support in the courts. Such wills are not, indeed, absolutely void; but their execution may be regarded with jealousy and suspicion. 1 Schouler on Wills, etc., p. 91, § 77.

If there is evidence to support a verdict that the will was secured by undue influence, or that the testatrix was not of sound mind at the time she executed it, such issue is for the jury, although there may be weighty evidence to the contrary. Clark v. Briley (Tex. Civ. App.) 193 S. W. 419, writ refused.

Keeping these well-established principles in mind, we will now consider the evidence that tends to support the findings of the jury, which are attacked in two assignments in appellants' brief. In addition to what has been heretofore said as to the treatment of Mrs. Joplin by her brother and nephew, two beneficiaries under the will, when she reached the home of her dying mother, in prompt response to the message that her mother was seriously ill, and the refusal by these two beneficiaries to even invite her into the house, and to let her see her mother, there are other facts which tend to support the jury's findings:

1. All of the beneficiaries had access to the sickroom of the testatrix during her last illness, and the daughter and grandson, had lived with her for years and had full opportunity to exercise an influence to cause the testatrix to practically exclude the only child of her first marriage from the fruits of her bounty.

2. The testatrix had reached an age, 75 years, at which generally there is more or less of mental and physical impairment, an age when a person becomes more or less dependent on those most closely associated with him and upon whom he is dependent for supply of his daily needs.

"Persons differ greatly both in mental and physical resources after passing the meridian of life; some declining rapidly, others by degrees almost imperceptible. In one the intellectual functions operate with healthy precision far into the vale of years, the power of volition dominating over the ills of flesh; in another the loss of mental power and energy seems to precede the loss of physical strength; but probably in a majority of cases, both mind and body begin to fail together soon after the prime of life is reached. We detect more easily when the bodily vigor and elasticity of mature life shows signs of departure than we do the approach of mental feebleness; in the former respect an old person admits his lapse, while he may persistently deceive himself and others in the latter; moreover, as Judge Redfield has well observed by way of comparison, our uncertainty in estimating the powers of the mind is the greater, since the increase of experience and knowledge which time produces at all stages of advancing life compensates much for the decline of the mental faculties and powers." 1 Schouler on Wills, etc., p. 147, § 131.

3. The testatrix in this case is shown to have been stricken with paralysis, which sometimes is a cause of mental derangement, and, if attended with apoplexy or an affec-

tion of the nerves, it necessarily affects the mind.

"Where one, after paralysis or some enfeebling disease, attends to his business and manages his property with reasonable prudence and judgment, the inference of his renewed testamentary capacity must be very strong." 1 Schouler on Wills, etc., p. 132, § 116.

4. The testatrix had her attorney make the statement in the will that the reason she gave Mrs. Joplin only $5 was that all of the property owned by the testatrix was the community property of herself and deceased husband W. T. Caldwell, and that said property was accumulated through his efforts, industry, and economy. Mrs. Joplin pleaded that her funds purchased both the west one-half of section 86, block 4, of the Houston & Texas Central Railway Company survey, and the homestead place in Cisco, and she testified as follows:

"I owned some property west of the T. P. Railroad, in Cisco, Eastland county, Tex. I turned my property over to my father, W. T. Caldwell, to look after it for me. I had full confidence in him. I suppose my mother knew of those relations. She heard us talking. * * * * That was W. T. Caldwell, my stepfather, that I refer to as Pa. I told my Pa to use my money in buying him a house, just so he gave me something back, and I suppose he did that, as I signed a deed, but didn't get any proceeds from it. Pa was handling my money and property. I thought he was capable of handling it. My father and mother were then living together as husband and wife, in the same house. They built a house on the half block that I told them to build on."

5. This evidence was not contradicted so far as we find, and, if true, is contrary to the statement made in the will that all of the property possessed by the testatrix was acquired through the economy and industry of her deceased husband. Therefore we must conclude that the jury were authorized in finding that the memory of the testatrix was failing at the time she executed the will.

6. J. Alexander testified that he had lived in Cisco for nearly 40 years and had lived at Eastland before he went to Cisco; that he had known W. T. Caldwell during his lifetime and had known Mrs. Caldwell up to the time of her death, and had known the children, including Mrs. Joplin and R. W. Caldwell. He further testified: that he learned that Mrs. Joplin was in Cisco in August or September, 1914, for the purpose of seeing her mother, and that he knew that Mrs. Caldwell was in a very critical condition at that time, and, as called, "on her deathbed." That he went into the home where Mrs. Joplin was staying and saw Will Caldwell and Mrs. Joplin; that he asked Mrs. Joplin if she had come to see her mother in her last days. That Mrs. Joplin replied, "No, I haven't seen her yet," and I said, "You haven't seen your mother yet, and she is dying?" She said, "No, they refused to let me in," and I simply remarked: "They wouldn't allow you to see her? They wouldn't allow a mother to see her daughter or a daughter to see her mother?" That R. W. Caldwell said: "We don't want any outsiders interfering." Alexander replied: "I am not interfering; I am simply surprised that you wouldn't let your sister see your mother." While on the stand, R. W. Caldwell admitted that the substance of this conversation occurred between him and Alexander.

7. James Caldwell testified that, when his aunt called at the home of Mrs. Caldwell and asked to see her mother, he went into the sickroom of Mrs. Caldwell and asked her if she wanted to see Mrs. Joplin; that "she became excited and nervous and told him very positively she did not want to see her, and I had instructions from the doctor that she must not be excited or worried by anything. As I had been her nurse and taking care of her, I followed out those instructions and her own wishes."

Taking into consideration the testimony of Mrs. Joplin that the relationship between her and her mother had always been pleasant and affectionate, the jury were authorized to believe, either that James Caldwell did not tell his grandmother that her daughter was there to see her, or, if he did, that the statement imputed to the testatrix was evidence that she was in a disturbed mental condition. It is further shown by the testimony of Mrs. Joplin that the will was executed by Mrs. Caldwell while Mrs. Joplin was in Cisco. James A. Caldwell further testified that when Mrs. Joplin reached Cisco his grandmother was in a serious condition.

8. Dr. Griffin, the attending physician, was not called as a witness, and Mrs. Stella Degenhardt was absent from the trial, sending a doctor's certificate that she was sick and unable to attend court. This doctor's certificate seems to have been written at Amarillo Tex., though it is not stated that Mrs. Degenhardt lived at Amarillo at the time of the trial.

[3] From the facts and circumstances stated, and from others which the record discloses, we conclude that we are not justified in reversing the judgment for lack of proof to sustain the verdict of the jury.

Both assignments are overruled, and the judgment is affirmed.

### On Motion for Rehearing.

Appellants, on motion for rehearing, call our attention to the allegation in contestant's petition that Mr. and Mrs. Degenhardt and R. W. Caldwell live at Amarillo, Potter county. Hence the statement in our original opinion that Mrs. Degenhardt's place of res-

'dence was not stated in the doctor's certificate is true only so far as the statement of facts discloses.

We have carefully read and considered appellants' motion for rehearing, but we do not believe we would be justified in reversing our former decision.

The motion is overruled.