**MOORE et al. v. MARTIN.   (No. 1729.)**

(Court of Civil Appeals of Texas. El Paso. May 28, 1925. Rehearing Denied June 11, 1925.)

1. **Wills 🗝230—Wife not estopped from contesting will under circumstances not showing election to stand by it.**

That wife was with her husband just before and after making will, and knew of it and circumstances surrounding it, was present and testified when will was probated, and was party to judgment, but did not contest will for 2 years thereafter, *held* not to estop her from pleading invalidity of will, in absence of any showing of election to stand by or uphold validity of will or judgment probating it.

2. **Wills 🗝359—Courts cannot qualify or limit statutory right of appeal.**

Contestant's statutory right of appeal under Vernon's Sayles' Ann. Civ. St. 1914, arts. 3631, 3632, from adverse decree in proceedings to contest will, cannot be limited by conditions imposed by the courts.

3. **Wills 🗝53(1)—Deed to testator before marriage competent on question of incapacity, where he believed property so conveyed was community property.**

In contest by wife of husband's will for lack of testamentary capacity, deed of land to husband some years before marriage, though of little probative force, *held* properly admitted on question of incapacity in connection with evidence that he thought, at time of making will, that land so conveyed was community property.

4. **Wills 🗝400—Court will not presume an improper use of evidence.**

Where deed to husband before marriage was admitted to show testamentary incapacity in connection with belief of testator that property conveyed was community property, court on appeal will not presume that evidence was improperly used in argument to show unfairness of testator's disposition, when record does not show such argument.

**5. Wills ⊕⟶52(1)—Burden is on opponent to show testamentary incapacity.**

Burden is on person attempting to avoid the will to show testamentary incapacity at time of execution.

**6. Evidence ⊕⟶5(2)—It is common observation that juries readily seize an opportunity to break wills.**

While courts are fond of sustaining wills, it is a matter of common observation that juries readily seize an opportunity to break them.

**7. Wills 324(2)—Evidence of testamentary incapacity sufficient for jury.**

Evidence that testator, 65 years of age, and suffering from physical ailments, had recurring intervals of mental unsoundness, followed by lucid intervals, *held* to make question of testamentary incapacity one for jury, and to sustain verdict against will.

On Rehearing.

**8. Wills ⊕⟶405—Fee of guardian ad litem for defending suit to avoid will properly taxed against minor.**

Under Rev. St. 1911, arts. 1942, 2035, 2048, fees of guardian ad litem for minor heir in unsuccessfully resisting suit to avoid will, *held* properly taxed to minor, and taxation against other contestees was unauthorized.

Appeal from District Court, Jones County; W. R. Chapman, Judge.

Suit by Mary A. Martin against W. P. Moore and others to annul the will of George B. Martin, her husband. From a decree for defendants, plaintiff appealed to the district court for trial de novo before a jury. Judgment for plaintiff, and defendants appeal. Reformed and affirmed.

Chas. E. Coombes, Cunningham & Oliver, and Wagstaff, Harwell & Wagstaff, all of Abilene, and John B. Thomas, of Anson, for appellants.

Turner, Seaberry & Springer, of Eastland, Stinson & Brooks, of Abilene, and Lea, McGrady, Thomason & Edwards, of El Paso, for appellee.

WALTHALL, J. This suit was instituted by Mary A. Martin to annul the will of George B. Martin, her husband. She filed her suit in the county court of Jones county on June 30, 1923, against appellants, W. P. Moore, Mrs. D. C. Reese, a widow, John Martin, Willie Martin, Polly Martin, Nina Martin, a minor, W. S. Martin, Una Springer and her husband, W. A. Springer, Mrs. Lydia Smallwood and her husband, H. B. Smallwood, Mrs. Ibbie Slaughter, a widow, Jane Martin, a feme sole, Mrs. Mary Gilkerson and her husband, George Gilkerson, to set aside the probate of the will of her husband, George B. Martin. George B. Martin died on July 31, 1921. The will was admitted to probate in the county court of Jones county on

October 20, 1921. In her suit in the county court Mary A. Martin, as ground for setting aside the probate of said will, alleged that at the time of making the will, on July 4, 1921, George B. Martin was not of sound mind, in that he did not at that time possess sufficient mental capacity to recall the objects of his bounty, and to associate the property or interest to be given to the particular beneficiary or beneficiaries, and to know what he desired to do with his property, and to understand the transaction involved by the terms of said will. She alleged that by reason of the facts stated the alleged will was and is void and should be set aside.

The citation duly issued, and the return thereon of the sheriff showing the service was duly made, is found in the record.

W. P. Moore, executor under the will, and each of the defendants, filed answers; the minor, Nina Martin, answering by her guardian ad litem as Nina Davis, the several answers being in effect general denials.

The county court on the trial rendered judgment and entered same of record, denying the application to set aside the will. Mary A. Martin duly prosecuted her appeal from the judgment and decree of the county court admitting the will to probate to the district court of Jones county, in which court a transcript of the proceedings in the county court was filed, and in which court all parties entered appearance and severally filed answers, and in which court the case was tried anew. The case was tried to a jury, and submitted upon one special issue, to wit:

"At the time George B. Martin signed the instrument in writing offered on the trial of this cause as the last will and testament of George B. Martin, deceased, dated July 4, 1921, did George B. Martin have testamentary capacity, as that term is above defined?" The jury answered: "He did not."

Upon the return of the verdict of the jury appellants and appellee filed their several motions for judgment. The trial court overruled appellants' motion for judgment, and sustained appellee's motion for judgment, and entered judgment setting aside the will. Appellants filed original and amended motions for new trial, which were overruled by the court, to which rulings appellants duly excepted, and in open court gave notice of appeal, and have perfected their appeal, and the case is now before this court.

Opinion.

The first four propositions question the sufficiency of the evidence to support the verdict of the jury and the judgment of the trial court based thereon, and from which it is reasoned that the judgment rendered setting aside the probate of the will is contrary

to the law and the evidence and should be set aside.

The fifth and sixth propositions claim error in admitting in evidence a certain deed; the contention being that the deed did not tend to prove or disprove any issue in the case, and was calculated to, and probably did, mislead the jury to an improper rendition of the verdict.

By the seventh and eighth propositions, and a portion of the ninth, it is insisted that by reason of the matters stated therein appellee is estopped to plead the invalidity of the will. The ninth and tenth propositions assign error to the rendition of the judgment, for the reason that appellee was a party to the judgment of the county court sought to be set aside and from which judgment no appeal was taken; that, she having failed to file a sufficient appeal bond in her appeal from the county court judgment, the district court did not have jurisdiction to try the cause, and for that reason the case here should be reversed and dismissed.

The eleventh and last proposition complains of the judgment's taxing the appellants, other than the minor, Nina Davis, with the guardian ad litem fee, insisting that there is no privity of interest between appellants and Nina Davis, and that the costs of defending the suit as to Nina Davis should not be taxed against them, but to Nina Davis alone, or against appellee.

We will first consider propositions 7 and 8 and a portion of 9, which question the right of appellee to plead the invalidity of the will in this suit.

[1] Propositions 7 and 8 are as follows:

Proposition 7. "The undisputed evidence showing that appellee was with her husband just before and after the making of the will, and that she knew of the making of the will and the surrounding circumstances in connection therewith, that she was present when the will was probated in October, 1921, that she testified before the court when the will was probated, and did not appeal from the judgment probating same, elected to stand by the will, and is now estopped to plead the invalidity of the will.

Proposition 8. "Appellee, having appeared in court when the will was probated in October, 1921, and having testified on the trial when the will was probated thereby became a party to the judgment probating the same, and having failed to appeal from said judgment, became a party to said judgment and is now estopped to plead the invalidity of said will in this suit."

The latter portion of proposition 9 recites that "appellee was a party to the judgment sought to be set aside, and has never appealed from the same."

The facts stated in the propositions are not entirely true to the facts disclosed by the record, as we understand them. The transcript of the proceedings had in the county court shows that the will of George B. Martin, deceased, was probated in the county court of Jones county in October, 1921, and that appellee instituted this suit on June 30, 1923, in the county court of Jones county in which she contested the validity of the will of George B. Martin; one of the grounds of her contest being, in legal effect, the same as that upon which the case was finally tried in the district court of Jones county. The record shows that appellants filed answer in said county court to said contest, and the case was therein tried and judgment entered, from which judgment contestant, appellee here, took an appeal to the district court of Jones county and gave an appeal bond within the time required and in the amount fixed by the county judge of Jones county.

[2] The facts recited in the propositions that appellee was with her husband just before and just after the making of the will, and knew of the making of the will, and knew of the circumstances surrounding the making of the will, and was present when the will was probated, and testified before the court when the will was probated, and was a party to the judgment, and did not file her contest for two years thereafter, would not estop or bar her from thereafter pleading the invalidity of the will. The record does not show that appellee did anything, and appellants have not pointed out anything appellee did, which effected an election on her part to stand by or uphold the validity of the will or the judgment probating the will, as stated in the propositions. Appellee was pecuniarily interested in the will probated, and instituted her suit in the proper court within the time required after its probate to contest its validity. Articles 3631 and 3632, Vernon's Sayles' Texas Civil Statutes, give her the right of appeal by complying with the provisions of the chapter in which the above articles are found, and no such qualifications of her right of appeal as are stated in the propositions are found in that chapter or elsewhere in the statutes of this state, and courts have no authority to impose conditions which qualify or limit the right of appeal not found in the statute. Edwards v. Morton, 92 Tex. 152, 46 S. W. 792; Beversdorff v. Dienger, 107 Tex. 88, 174 S. W. 576.

[3] The court admitted in evidence, over objection of appellants, a deed to certain lands referred to in the evidence as the Plains land, of date October 2, 1900. The objections to its introduction in evidence are that it was immaterial and irrelevant to any issue in the case, and was calculated to mislead, and probably did mislead, the jury in the rendition of the verdict. The deed conveys to George B. Martin, deceased, four leagues of land for a consideration of $531.33 cash, and one note of the date of the deed for $17,711 secured by a vendor's lien on the land conveyed, and payable on or before 18 years after its date, with 3 per cent. interest per

annum from date. The land was conveyed to George B. Martin, deceased, some four years before his marriage with appellee, Mary A. Martin, in 1904. The deferred consideration as above stated for the land was discharged, and improvements made on the land after his marriage with appellee. Appellee had introduced in evidence the pleading of appellant in another case in which one of the issues presented was whether the land was separate or community property of George B. Martin, deceased, and appellee, and in which pleading appellants here claimed the property to be the separate property of George B. Martin, deceased. The estimated value of the land described in the deed at the time of the making of the will was about $425,000 out of the total estimated value of the entire estate of George B. Martin, deceased. Appellants had offered evidence in explanation of the allegations in the said pleading alleging the land described in the deed to be the separate property of George B. Martin; the explanation being that the pleading was made because the attorney at the time the pleading was drawn did not have the abstract to the land before him, and did not know whether the land was separate or community property. Appellants had also, on direct examination, interrogated their witness, Judge Chas. E. Coombes, who wrote the will, in regard to the land being separate or community property, and offered the deed after he had testified that he explained in a general way to George B. Martin what constituted separate and community property and the law of descent and distribution. The witness had also testified that at the time the will was drawn he and Martin both thought the Plains land described in the deed was community property; that Mrs. Martin would get half of it; and that he had so listed the property. The will did not give Mrs. Martin any interest in the land embraced in the deed. It is not a material issue here whether the land conveyed to Martin by the deed was separate or community property, but by the admission of the deed in evidence in connection with other matters inquired about the question is presented: Does the deed tend to show the testamentary capacity or want of testamentary capacity of George B. Martin to make the will? The deed itself, executed some 23 years before the making of the will, certainly could not, of itself, throw any light upon the question of the mental capacity of Martin at the time of the making of the will. But the deed shows the title to the land to have originated and been in Martin at the time of the making of the will. Judge Coombes had explained to Martin, as we understand, that land owned or claimed by him before his marriage with appellee would be his separate property, and the evidence shows that in making the will Martin, after the explana-

tion as above made in close connection with the making of the will, thought the land was community property, and that Mrs. Martin would get one-half of it without any mention of it in the will, and the evidence, so far as we have found, does not show why Martin thought the land was community property, reasoning solely from the explanation, and the extent of it, given him by Judge Coombes, as found in the record.

[4] Would the deed, disclosing the title to be in Martin some four years prior to his marriage with appellee, in connection with the other facts above stated, tend to show that at the time of the making of the will Martin was incapable of understanding the nature of the business he was then engaged in, that is, making his will, or the nature and extent of his property, or that he did not have memory sufficient to collect in his mind the elements of the business to be transacted and to hold them long enough to perceive their obvious relations—issues of fact the trial court used in defining to the jury the term "testamentary capacity," and as to which the court put upon appellee the burden to prove the negative? We have concluded that the deed, however slight might be its probative force, was admissible in evidence on one or more of the evidentiary facts to be found by the jury in determining the issue of "testamentary capacity" of Martin to make the will. Appellants insist in their brief that the deed was offered for the evident purpose of showing that Martin was not fair and just to his wife, appellee here, in making his will, and for that reason the will ought to be set aside. Such use of the evidence in argument or otherwise is improper, and to avoid such use appellants should have had the court confine the consideration of the evidence to a proper use. But the record does not show the application made of the evidence in argument, and we cannot presume, in the absence of a showing, that an improper use or application of the evidence was made.

[5] We now turn to a consideration of the one vital issue in the case: Did George B. Martin, on the 4th of July, 1921, have such degree of testamentary capacity to meet the law's test in the making of the will? To avoid the will the burden was on appellee to show that he did not at that time have such testamentary capacity. In the threshold of this inquiry we must bear in mind, as has been well said, that the making of a will is not a matching of wits; it is giving, not bargaining. The very purpose of the statute relating to wills is to permit the testator to make a will different from the will the law would make; that is, to let the distribution of the estate flow in channels outside of the general statute of descents and distributions. The true measure of testamen-

tary capacity is easy of statement; has been often repeated in the decisions of the courts of this and other states, though not always in the same language; and needs no exposition or elaboration. In this case the trial court submitted to the jury the evidentiary facts to be considered by them in determining the issue of testamentary capacity, and neither party to this appeal has made objection thereto. The insistence of appellants, in effect, is that the evidence is insufficient to show a want of testamentary capacity to make the will, and for that reason the judgment ought not to be sustained. The court's charge to the jury is as follows:

"By the term 'testamentary capacity' as herein used is meant that the testator or person executing a will must have been capable at the time of the execution of the will of understanding the nature of the business he was engaged in, the nature and extent of his property, the persons to whom he meant to devise and bequeath it, the persons dependent upon his bounty, and the mode of distribution among them; that he must have had memory sufficient to collect in his mind the elements of the business to be transacted, and to hold them long enough to perceive at least their obvious relations to each other, and be able to form a reasonable judgment as to them."

[6] The evidence taken on the trial covers 362 pages of the statement of facts, embracing the testimony of about 41 witnesses, besides record evidence. While we have carefully reviewed the entire record, it will be impossible for us, in the short space of an opinion, to transcribe but little, if any, of the verbiage of the witnesses. We can do no more than get the viewpoint of the witness and of those, more particularly, whose testimony seems to reflect the mental condition of the testator about and at the time of the execution of the will. Our inquiry here is to determine whether the judgment of the trial court can be sustained under the well-recognized rules which courts apply in similar cases, such as Cartwright v. Canode, 106 Tex. 502, 171 S. W. 696; Selz v. Shipman (Tex. Civ. App.) 230 S. W. 842; Pendell v. Apodaca (Tex. Civ. App.) 221 S. W. 682; Degenhardt v. Joplin (Tex. Civ. App.) 239 S. W. 692; Whitney v. Murrie (Tex. Civ. App.) 264 S. W. 270. In considering the evidence we are not unmindful of the fact that, while courts are fond of sustaining wills, it is a matter of common observation that juries readily seize an opportunity to break wills, apparently never doubting their ability better to decide what should be done with a man's property than the man himself could do. Huffnagle v. Pauley (Mo. Sup.) 219 S. W. 373.

[7] Much of the evidence is extremely remote in point of time, though from intimate friends and those closely connected with him in business relations, and, while competent, much of it has but slight probative force. It might be said that, while the testator had diseases of his body that had been in his system for years prior to the making of his will, yet up to a comparatively short time prior to the making of his will he was apparently a strong, robust, and energetic man, mentally and physically. We will note very briefly, first, the conclusions of some of the doctors who had Martin under observation about the time the will was made.

Dr. Braswell, of Braswell Sanatarium, Fort Worth, a witness for appellee, testified: Martin was his patient for some 3 weeks in April and May, 1921. He states in detail the extent of his examination and his diagnosis made at that time of Martin's physical and mental condition. He referred to Martin's mental condition several times, saying that he was not normal, and not insane, had some reasoning power, but impaired, on the one hand non compos mentis, and a normal man; "would play the scale from one end to the other." "Sometimes he would be bright, other times not"; an unusual man; "had a wonderful vitality, a wonderful brain. He could come back through the cloud and fog when other men could not, and for that reason he remained rational longer than an ordinary man because of his wonderful power and his extreme acuteness. He was above the ordinary man in natural ability, and he fought this through with his will power when other men would have given down. * * * He was very intelligent, and in lucid intervals he could do anything as long as they lasted. He was very forgetful, especially in regard to recent events." In answer to questions as to whether Martin was of "sound or unsound" mind at the time the witness had him under his observation in April, 1921, the witness answered, "Unsound," and further said:

"I think Mr. Martin was of unsound mind long months before I ever saw him. In my opinion on July 4, 1921, he would be of unsound mind. Those lucid intervals would come and go, just the exact hour they would come and the exact hour they would go, I don't know, but as a general whole I will say he was of unsound mind. A lucid interval, the sun shining through a rift in the clouds, don't mean a clear day. * * * His mental condition would continually grow worse."

On cross-examination the witness said he never heard Martin made an irrational statement. He had no hallucinations, no illusions, no delusions. He would have a disconnected or impaired memory, and that would irritate him. The witness said:

"I think that when he was at my office (from April 16, to May 3, 1921) he could understand and know the property he possessed and the nature and extent of it. I think he could have transacted business of that serious character like writing a will, if he had been given time, parts of days and different days, at times when he was lucid, a little to-day and a little to-mor-

row, and lead him out from time to time and day to day; after a while you could get the absolute expression of his will; there would be other times when he couldn't."

Dr. Alexander, a witness for the appellants, testified: Is proprietor of the Alexander Sanatorium at Abilene; had known Martin 25 or 30 years; was under his treatment from June 28 until July 10, 1921; made examinations of him to determine the treatment; talked with him frequently; discussed with him the manner of executing his will; Martin was a mighty sick man; he left unimproved; stated Martin's troubles; went into the matter of his troubles very thoroughly, their history, and stated of what they consisted and how they affected him; signed the will as a witness on July 4th; said:

"On this date, July 4, 1921, at the time I signed as a witness to this instrument, in my opinion George Martin was of perfectly sound mind."

Dr. J. M. Estes, a witness for appellee, in response to a lengthy hypothetical question involving the ailments of Martin, concluding as follows: "Now, Dr. Estes, in your judgment and opinion was such a man as above described of sound or unsound mind on July 4, 1921, 27 days before his death?"—replied that "he was of unsound mind," explaining that the mind was unsound in the sense that it was incapable of performing its normal function.

We find no statement in the testimony of Dr. Brown of any special probative value more than that Martin was a sick man and that his physical condition was caused by one or more of the diseases testified to by other physicians.

Dr. Bunkley, who treated Martin, while his examination as a witness was not as extensive as Drs. Braswell and Alexander, says:

"From my observation of George Martin at Stamford Inn, and when he was under my treatment, and when I was treating him just after he came back from Fort Worth (when he was under treatment of Dr. Braswell, as above), I certainly did not detect that he was other than of sound mind. In my opinion he was of sound mind while he was at Stamford."

A number of other witnesses were called by appellee to testify, who had more or less opportunity for observing Martin. Many were his former comrades of the trail; had watched his progress and success as a cow man; and had seen his physical collapse and mental impairment. Others had been his constant companions and pals during the last few years of his life before his breakdown. All were his friends. They testified to his earlier physical powers and mental alertness. Some spoke of his attacks of influenza, his headaches, his recent stooping,

tottering walk, his conversations in regard to his more recent condition, of his crying at the sight of his old friends, of Martin's references to himself as "an old rundown Ford." "I can't get my wits together," "I can't think." "Mary (his wife) does my calculating"; of his "night sweats." Some referred to Martin as "little unbalanced"; "not normal"; "stupid"; "forgetful"; "not at himself"; "not rational"; "not right." Some testified that Martin complained of having swimming in his head; was ashamed to walk down the streets of Stamford—want of inco-ordination of his muscular system.

Appellee makes the contention that in determining the sufficiency of the testimony to sustain the verdict and the judgment she may legally insist that evidence of her witnesses alone be considered, and that the evidence of appellants' witnesses be disregarded. We cannot say, however, from the facts as disclosed by appellee's witnesses, that "all reasonable men must draw the same conclusion from them," as did the jury. We think the evidence presents an issue of fact. Cartwright v. Canode, supra. Some features of the testimony, also, we will notice later.

A number of witnesses testified in behalf of appellants, several of whom saw Martin in the sanatorium at Abilene on the day he made the will, and talked with him. We need not detail the circumstances under which the witnesses saw and conversed with him, or the facts stated from which their conclusions are drawn, more than to state their conclusions that Martin was of sound mind.

Judge Charles E. Coombes, who wrote the will, was called to testify in behalf of appellants. He testified he had known Martin since 1893; had had many business transactions with him in examining titles and litigation; wrote two wills for Martin during the days from July 1 to July 4, 1921; talked to Martin about his will in May, and in June, and on the 1st, 2d, and 4th days of July, 1921. In the first conversations he did not fix a day for writing the will, advised him as to law of descent and distribution of property, and separate and community property. In response to a letter from Martin on June 30th, he went to see him on July 1st at the Alexander Sanatorium at Abilene; was with him about an hour, at which time went into detail with witness without being prompted as to the disposition he wanted to make of his property; wanted to give his wife a life estate in his interest in the 33 sections called the Home ranch, and to cease in case of her marriage; wanted to give her a $10,000 legacy; wanted W. P. Moore executor, and witness (Coombes) as substitute executor; wanted the balance of his property divided between his brothers and sisters and their descendants, and gave their names; wanted the title in his execu-

tor with authority to sell the property and
divide the proceeds. Afterwards hearing the
pencil notations read to him, he then said
he did not want the executor to distribute
the proceeds until as much as $30,000 was
on hand, leaving it to his executor's judg-
ment whether he would distribute it at a
less sum or not; did not want the executor
to be required to give bond; and no action
taken except to probate the will. His wife
was to have the cattle and other personal
property on the ranch. He wanted his wife
to have her interest in the community prop-
erty, and spoke of the 33 sections as being
partly separate and partly community prop-
erty; said he wanted the banking business
of the estate done with such bank as Roy
Riddle was personally connected with, and
wanted his executor to have half of the fees
allowed by law as was expressed in the Eel
Skin Davis will of Throckmorton county.
The witness drafted the will in pencil, and,
with the change in the pencil draft as above,
the will was typewritten and executed on
July 2d, as then written. As beneficiaries
Martin had given the names of his brothers
and sisters, namely: Mrs. D. C. Reese, the
heirs of John Martin, naming them, Mrs.
Lydia Smallwood, W. S. Martin, Miss Jane
Martin, and Mary Gilkerson. He had not
mentioned his stepdaughter, Una Springer,
and in reply to an inquiry from witness if
he had not overlooked that Martin said he
had, and said he wanted to give her the
Head section then in her possession; do not
think he could remember the number of that
section; the description he could rely on was
its distance from town. That was added.
That will at request of Martin was mailed
by witness to the First National Bank of
Anson. Martin never saw that will after it
was signed and witnessed. Witness then
went to Cisco. On the 3d of July witness
received a letter signed in the name of Mar-
tin, but most likely in the handwriting of his
wife, saying, in substance, that he awoke
last night and was thinking how the will
read; "that it read that it wanted to be
divided into six equal parts, it should have
read in seven equal parts." He said:

"The bust is all on me, and I think Ibbie
Slaughter that was left out, and I would not
have anything to happen to me and it in that
shape for anything."

He called witness back to Abilene on July
4th, discussed the matter with Martin, and
made the changes indicated, and that will
was executed, and at the suggestion of Mar-
tin was handed to Dr. Alexander to be put in
his safe. That will was probated. At time
of writing will witness knew that Martin
thought the Plains land was community
property, and that his wife would get one-
half of it under the law of descent and dis-
tribution. The witness testified:

"At the time I saw George Martin at Fort
Worth and at Stamford and at Cisco, and on
these different occasions at Abilene, from the
transactions I had with him and from the state-
ments he made and from my observation of
him, in my opinion he was a man of sound
mind; I do not have any doubt of it at all."

There is much else of this witness' tes-
timony we would like to state, but for sake
of brevity we must refrain from so doing.

Some of the witnesses, when questioned
as to what they meant in answering that
Martin's mind was not sound, replied that
his mind was not as strong as when he was
a well man. Not all of the witnesses were
given an opportunity to explain what was
meant by an unsound mind; nor were all
of the witnesses asked what was meant by
saying Martin's mind was sound.

At the expense of reiterating a portion of
the evidence of Dr. Braswell who had scien-
tifically and very clearly drawn the distinc-
tion between a normal and an abnormal mind,
and had most emphatically said that Martin's
mind was "not normal," was "impaired,"
"would play the scale from one end to the
other, sometimes down and sometimes up,
sometimes he would be bright, other times
not," "would vary from no mind up to the
normal mind," "between no mind at all and
a normal mind," and concluded that when
at his office Martin could understand and
know the property he possessed and the na-
ture and extent of it, and "could have trans-
acted business of the serious character like
writing a will, if he had been given time,
parts of days and different days, at times
when he was lucid;" the writer of this
opinion thinks it not unreasonable, or unfair,
or a misinterpretation of the real meaning
of the testimony of the witnesses who said
that Martin's mind was not sound, and of
those who said his mind was sound, so far
as their observations extended and their op-
portunity to know, would have explained as
did those who were given the opportunity
to explain, that, while Martin was a very
sick man, he was not absolutely abnormal,
or not absolutely normal. The evidence
should be harmonized, if possible, so as to
know its real meaning and probative worth.
It may be, and would not be inconsistent with
the statement of Dr. Braswell, that some of
the witnesses saw Martin at lucid moments,
and others at times when he was otherwise.
Some saw him when his mind was at one
end of the mental scale, while others saw him
when his mind was at the other end. In
view of the testimony, we cannot say that
Martin's testamentary capacity remained
stationary, absolutely normal, or absolutely
abnormal, during the several days he was
directing the making of his will. We un-
derstand from the record that Martin was 65
years of age when he undertook to make
his will, an age at which there is generally

more or less of mental and physical impairment. As Mr. Schouler in his work on Wills says: Persons differ greatly both in mental and physical resources after passing the meridian of life, some declining rapidly; others by degrees almost imperceptible. In one the intellectual functions operate with healthy precision far into the vale of years, the powers of volition dominating over the ills of the flesh; in another the loss of mental power and energy seems to precede the loss of physical strength; so that it becomes a matter of proof as to the extent of the mental loss in each individual instance. Here, after some three weeks of personal observation, two expert witnesses, with days of opportunity for observation, a short time before the will was in actual preparation, and one at the very period covering the several days when the will was in preparation, the three apparently wholly disinterested, all specialists in the line of expert service to Martin, each knowing that his remaining days are few at best, they speak to him about making his will,

"Or ever the silver cord be loosed,
　Or the golden bowl be broken,
　Or the pitcher be broken at the fountain,
　Or the wheel broken at the cistern,"

—and after the inevitable has happened, each are called to testify as to his testamentary capacity to make the will. These physicians, after detailing the many ills of Martin, and their characteristics, and the effect they have upon his physical and mental forces, so far as the crucial point of inquiry here is involved, they apparently practically agree.

Knowing the issue of fact to be decided on the trial, Dr. Braswell says Martin had mental capacity to make a will, if given time, which was done. Drs. Alexander and Bunkley say Martin had a sound mind. The law guards the right to make a will with jealous care. While our statute expressly recognizes that right, it places restrictions upon its exercise. He must be of sound mind; that is, he must have the testamentary capacity to do so. Martin undertook to exercise that right. In considering his efforts to do so we must given him the benefit of every reasonable inference and deduction.

It is clear to us that a larger and valuable portion of the property, the Plains land, would not go exactly as Martin probably thought it would, if it was not wholly community property, for he dealt with it in his will as community. At the time he made the will the evidence shows he thought the Plains land, if not community property, was partly community property and partly his separate property.

It is not our purpose to express any opinion as to the character of the title of the Plains land as being separate or community property, and we do not do so, but appellee refers to the fact that Martin told Judge Coombes that the Plains land was community property, and he intended to devise to appellants only a one half interest in it, and intended the other half to remain in his wife, and appellee reasons from that circumstance that Martin did not have memory sufficient "to collect in his mind the elements of the business to be transacted, and to hold them long enough to perceive at least their obvious relations to each other and be able to form a reasonable judgment as to them."

What Martin thought of the property as being separate or community, or what of the property he intended to devise to appellants, or what he intended to remain in his wife, are apparently facts upon which evidence could properly be offered, but deductions to be drawn therefrom as to his memory would be an argument.

Now, the specific questions as to Martin's memory to collect in his mind the elements, etc., and his ability to hold them, and his ability to form a judgment as to them, were not specifically submitted to the witnesses in questions and answers elicited, nor to the jury as facts to be found in determining the testamentary capacity of Martin. We must look to all of the evidence in the case in determining the strength of his memory and in the matter of the making of his will, and in determining the sufficiency of the evidence as a whole to support the one general finding that he was not of sound mind. Whether property is community or separate property is often a difficult matter to determine. Especially would that be the case here, where the property was purchased by Martin, with a comparatively small part of the consideration paid at the time of the purchase, and the large unpaid balance, with interest and taxes, and improvements thereon were made through a series of many years after marriage. Had Martin undertaken to dispose of the property as his separate property, and had he been mistaken as to its character as being his separate property, we think that circumstances would not, as a matter of law, show that he was wanting in testamentary capacity, and the competency or incompetency of Martin in making his will to understand the complicated question of the Plains land as being separate or community property under the circumstances stated, nor would it hardly be a proper test of his mental capacity to make his will, being a higher test alone than the law requires.

Without further reviewing the voluminous evidence in the case, it is sufficient to say we are all agreed that it raises an issue of fact as to the testamentary capacity of the testator which it was the duty of the court to submit to the jury. Cartwright v. Canode, supra, and other cases cited above.

Upon the question of whether this court should set aside the finding of the jury upon such issue, the other members of the court are of the opinion that the evidence is sufficient to support the finding, and this court should not set it aside. As to this view that the finding should not be set aside the writer, with reluctance, yields to the judgment of his associates.

Appellee admits that under the holding of this court in Pryor v. Krause, 168 S. W. 498, and cases there referred to, the costs allowed the guardian ad litem should not have been taxed against appellants other than Nina Davis, so in that respect the judgment will be reformed.

Reformed and affirmed.

## On Rehearing.

[8] The appellant Nina Davis complains of the action of this court in taxing against her the fee of the guardian ad litem appointed by the court below for the purpose of defending the suit in her behalf. She asserts that under the authority of Pryor v Krause (Tex. Civ. App.) 168 S. W. 498, and Rogers v. Rogers (Tex. Com. App.) 240 S. W. 1104, the costs should be taxed against the appellee.

The cases cited present a different state of facts from that reflected by this record. Article 1942, R. S. 1911, provides that the fee of the guardian ad litem shall be taxed as a part of the costs of the suit, and article 2035 provides that the successful party shall recover of his adversary all the costs expended or incurred therein, except where it is or may be otherwise provided by law.

Article 2048 provides that the court may, for good cause to be stated on the record, adjudge the costs otherwise than as provided in the preceding articles of that chapter.

The decisions in the cases cited by the appellant Nina Davis are referrable to article 2048, although they do not expressly so state.

There is nothing in this record to justify taxing the fee of the guardian ad litem against any of the parties to this suit other than the minor whom she represented as provided by article 2035. Holloway v. McIlhenny, 77 Tex. 657, 14 S. W. 240; Brown v. Brown (Tex. Civ. App.) 230 S. W. 1058.

Said appellant suggests that there is nothing in this record to show that she has any estate, but we do not so regard it. She appears to be an heir at law of the testator, and, as such, will inherit a portion of the estate of George B. Martin. We see no occasion to comment further upon the questions presented by this appeal.

Motions for rehearing are overruled.