HENSON et al. v. ADKINS. (No. 11418.)

(Court of Civil Appeals of Texas. Fort Worth. Nov. 6, 1926. Rehearing Denied. Dec. 11, 1926.)

1. **Wills** ⬅️324(2, 3)—**Mental incapacity and undue influence are fact issues for jury, unless reasonable minds cannot differ.**

Mental incapacity or undue influence are issues of fact in will contest, and the trial court cannot withdraw the case from the jury, unless the evidence thereon is such that reasonable minds cannot differ.

2. **Wills** ⬅️324(2)—**Testator's mental capacity held for jury (Rev. Civ. St. 1925, art. 8281).**

Testator's mental capacity to make a will under Rev. Civ. St. 1925, art. 8281, held for the jury on conflicting evidence.

3. **Witnesses** ⬅️397—**Probative effect of testimony in will contest that testator was not of sound mind held not absolutely destroyed by contrary testimony in probate court.**

Probative effect of witness' positive testimony, on trial of will contest, that in his opinion testator was not of sound mind when he made will, held not absolutely destroyed by fact that he had testified differently in probate court; matters of conflict going to his credibility.

Error from District Court, Denton County; C. R. Pearman, Judge.

Proceedings by Elmer Lee Henson and others, contesting the will of N. H. Henson, deceased. Judgment for Lucy Bell Adkins and others, contestees, and contestants bring error. Reversed and remanded.

See, also, 256 S. W. 967.

Thomas, Frank, Milam & Touchstone, of Dallas, and Owsley & Owsley, of Denton, for plaintiffs in error.

Sullivan, Speer & Minor, of Denton, and H. L. Davis, of McKinney, for defendant in error.

BUCK, J. This is a contest of the will of N. H. Henson, the three adult sons of Henson by the first marriage being the contestants, and the three minor children of Henson by his last marriage and his widow being the

contestees. After the completion of the testimony, the trial court gave a peremptory instruction for the contestees, and the contestants have appealed.

Henson died on October 23, 1918, after an illness of some eleven days. He was taken with influenza, which went into pneumonia. On Monday morning, October 21st, he made his will. R. L. Barnum, of the town of Frisco, several miles from the Henson farm and residence, wrote the will. The will is as follows:

"State of Texas County of Denton:

"I, N. H. Henson, of the county of Denton, state of Texas, being in good bodily health, and of sound and disposing mind and memory, and fully realizing the uncertainty of life and the certainty of death, and being desirous of settling my wordly affairs while I possess the capacity and strength so to do, hereby make and publish and declare this my 'last will and testament, hereby revoking all other wills heretofore made by me that is to say, first, I direct that the expenses of my last sickness, including the expenses of my funeral, be first paid in full. Second, to my elder son, Elmer Lee Henson, I give and bequeath the sum of one dollar in cash. Third, to my second son, Will S. Henson, I give and bequeath the sum of one dollar in cash.

"Fourth, to my third son, John E. Henson, I give and bequeath the sum of one dollar in cash.

"Fifth, to my wife's eldest son, Herman S Henson, I give and bequeath the sum of one dollar in cash.

"Sixth, to my wife's second son, Albert Henson, I give and bequeath one dollar in cash.

"Seventh, I give and bequeath to my beloved wife, Lucy Bell Henson, all the remainder of my estate while and as long as she remains my widow, consisting of 305½ acres of land, valued at $150.00 per acre, $3,300.00 Liberty bonds, $200.00 Thrift stamps, together with all of my live stock, consisting of about 28 head sheep, about 12 head of cattle, 4 head mules, 2 head of horses, 1 binder, 1 drill, 2 wagons, 1 disk harrow, 1 section harrow, together with about $600.00 in notes, and all of my cash on hand and in bank, and all crops now on hand, and yet to be gathered for this year 1918, with all cotton consisting of 5 bales, also all of the household and kitchen furniture now in use in the family residence; for and during her natural life, as long as she remains my widow, after which if she fails to remain my widow, I desire and direct that for the benefit of my three minor children, Nicholas H. Henson, Jr., England Henson, and Stella Mare Henson, now minors, I give and bequeath all of my estate of whatsover kind, and desire and direct that a guardian shall be appointed for them during their minority. I further desire and direct in order to avoid any confusion or contention that there be none of the property or lands, loaned or rented to either my senior or her senior children or none of my brothers or my wife's brothers.

"In testimony of all of which I hereunto set my hand, at my home in Denton county, Texas, in the presence of D. L. Vandeventer and W. B. Staley, Jr.

"Witnesses this 21st day of October, 1918.
                              "N. H. Henson."

The three sons of Henson by his first marriage are Elmer, about 35 years old at the time of the trial, Silas, about 32, and John, about 29. After the mother of these boys died, in 1896, Henson married his second wife, who subsequently died with her two infant children. In 1903, Henson married a young widow, Mrs. Lucy Bell Leon. She had been divorced from Frank Leon at the time of her second marriage. She had two children as the result of her marriage with Frank Leon, Herman and Albert. There were three children born to Henson and his third wife, to wit, Nicholas, Stella, and England. Henson formerly lived in Hill county, and soon after his third marriage he moved to Runnels county, where he bought several small tracts of land and farmed there some seven years. He then moved back to Hill county and lived there for two years. He then moved to Denton county, where he prospered and bought and paid for the 305 acres of land that he held at his death. He was about 45 years old when he died.

The evidence shows that the three older boys, after they were big enough to labor on the farm, worked with their father and stepmother in attending to the farm in Runnels county, until Elmer, the oldest, was about 16 years of age, when he enlisted in the army and never lived at home any more. Later, and when about the same age, Silas, the second son, left home, and then John, when about 15 or 16 years of age, left home. None of the three older sons, after they left home, were dependent on their father for support. He did loan them money at various times, but it was always returned, and at least Elmer loaned his father some money shortly before his death. At the time of Henson's death, Silas was in the army, a lieutenant at Camp Zachary Taylor, Ky., and John was in the army in France; Elmer was in Clarksville, Tenn., running a mill. In August, before his death, Henson went back to Kentucky, where he had formerly lived, and visited his father and other relatives and his sons Silas and Elmer, the latter in Tennessee. At various times he spoke of his three older sons in terms of pride and affection, and seemed to be proud of their progress in the business world, and was especially proud of the two sons going into the army during the World War.

## Opinion.

[1] The statement of facts contains more than 150 pages, and it would serve no useful purpose for us to copy in this opinion any considerable portion of the testimony offered. We believe the testimony does present a question of fact, to be determined by the jury in this case, as to whether or not at the time the will was made the testator was of sound mind, capable of understanding the nature of the business in which he was engaged at the time of his death, of what his estate con-

sisted, the objects of his affections and bounty, and to whom he wished to give his property. The court has given a peremptory instruction for the contestees, appellees here, thereby determining that the evidence did not present questions of fact concerning which reasonable minds could differ. Mental incapacity or undue influence are issues of fact, and the trial court is not authorized to withdraw the case from the jury unless the evidence upon these matters is of such a nature that reasonable minds cannot differ as to it. Cartwright v. Canode, 106 Tex. 502, 171 S. W. 696; Stolle v. Kanetzky (Tex. Civ. App.) 259 S. W. 657; Kirksey v. So. Traction Co., 110 Tex. 190, 217 S. W. 139; Reinhardt v. Nehring, 283 S. W. 347, by the Austin Court of Civil Appeals.

[2] Article 8281, Rev. Civil Statutes 1925, provides that:

"Every person aged twenty-one years or upward, or who may be or may have been lawfully married, being of sound mind, shall have power to make a last will and testament, under the rules and limitations prescribed by law."

In our opinion, the testimony does present a conflict, which the trial court, in a jury trial, was not authorized to determine in the absence of a verdict by the jury.

Albert Vassar testified: That he sat up with the deceased on Saturday night before he died at 1 a. m. Tuesday. That he was very restless during the night and his mind seemed to be wandering. That there was a small dresser near the foot of the bed with a bottle of medicine about four inches high sitting on it, and, looking at the dresser, Mr. Henson said, "Little boy, get away from there, that will fall on you and hurt you," when there was no little boy near and nothing that could be mistaken for one. That one time during the night he said, "Whoa! whoa, mule!" and one time he said, "Somebody is getting my money." That he looked wildly out of his eyes, and his actions and appearance made the witness believe that his mind was wandering. That he sat up with Mr. Henson the night of his death, together with Jim Simmons and Wallace Staley, and that his condition was very bad that night and he did not seem to be rational or to know what he was doing. That he asked the witness twice during the night to get his clothes, that he wanted to go in the other room where his mother-in-law and father-in-law were sick. That they tried to keep him from going, telling him that they could not find his clothes, etc., but he insisted on going in his nightclothes if he could not have his clothes, so finally they did put his clothes on him and he walked into the room where his wife's parents were and sank down on the floor. That he fainted, and that they had trouble in getting him back to the bed.

A. L. Denison testified: That he sat up with Mr. Henson on Saturday night, and that the patient seemed to be in a very bad condition. That he talked off and on all during the night, and witness did not think he was in his right mind during the night, although he did not know. That from his actions and the way he talked, witness did not think he was in his right mind. That one thing that caused the witness to think he was not in his right mind was that Mr. Henson had the witness to clean out an ash pan that had ashes in it for use as a cuspidor, which Mr. Henson said had a hole in the botton of it and the ashes would spew up through the top. That witness did not find any hole in it, nor did he see any ashes spewing up through the top. That Mr. Henson claimed that he saw a man looking in the window, but there was no man at the window.

D. L. Vandeventer testified: That he was a near neighbor to Henson, and on Monday morning they sent for him. That when he got there Mr. W. B. Staley, Jr., was there in addition to the family. That Mr. R. L. Barnum came later. That Mr. Henson was in about the same condition he was the night before, if not a little worse. That judging from what he saw and heard he did not think Mr. Henson was in his right mind. When Mr. Barnum started to write the will, Mr. Henson asked all of those present to leave the room, and that he and Mrs. Henson and Mr. Staley went out of the room. That he went into the north room where the fire was and where Mrs. Henson's father was, and that when he went back into the room to witness the will he found Mrs. Henson in there. He testified:

"From his condition and actions and all the things I saw there I would not think he was in his right mind; I would not think he was at that time. Of course, at times he would seem like he was and at times he wasn't. I had been there before during Mr. Henson's sickness, and I have heard him talk about the medicine they were giving him at different times. I can't recollect just exactly what he said about it, but he seemed to think the medicine was poisoned. He thought the medicine they were giving him was poisoned and was poisoning him. I couldn't say just how many times I heard him talk about that; it was at different times, though. That morning before Mr. Barnum came I did hear Mr. Henson say something about a mule or horse, seeing them when they wasn't there; he spoke about seeing a grey mule out there, and I couldn't see no mule. I expect that was about 20 or 30 minutes before Mr. Barnum came and wrote the will. I didn't see any grey mule out there; I could see all right, could see all over the place through the window. Yes, I believe I remember what his temperature was that morning before Mr. Barnum came; I believe it was 104; he had that high fever. It was then about 20 or 30 minutes before Mr. Barnum came or maybe longer I expect; I don't know just exactly how long it was. I would not think there was any change in Mr. Henson's condition from the time his temperature was taken and it was 104 and

he thought he saw the grey mule there until the time Mr. Barnum came and I signed this will."

[3] This witness further testified that he went over to the probate court of Denton county and testified that in his opinion the testator was of sound mind at the time he made his will, but at that time he did not know that the testator had left out of his will his three older sons. Counsel for contestees tried to make it appear that he had fabricated his testimony on the present trial, or had changed his mind about the testator's condition at the time of making the will because he had learned since then that the three older sons were practically excluded from the testator's bounty. But these are matters of conflict going to the credibility of the witness, and, inasmuch as he testified on this trial positively that in his opinion the testator was not of sound mind at the time he made the will, and names some reasons for his belief, the fact that he testified differently in the probate court cannot be said to absolutely destroy the probative effect of his testimony at this trial.

Witness J. R. Simmons testified: That he sat up with Mr. Henson on Sunday night, and the will was made on Monday morning. That Henson was very restless all night up until a few minutes before 3 or 4 o'clock. That as to whether he was in his right mind or not, he would seem to know things at times and at times he wouldn't. He was very restless and nervous and always planning trips to go to see Silas. That his eyes did not look right, were glassy, and he was very restless. That he sat up with Henson Tuesday night after the will was made. He testified:

"It is my opinion that Mr. Henson was not in his right mind that Sunday night when he was talking to me about making these trips to see Silas and those things he was talking about. On Tuesday night after the will was written he was not in his right mind."

Dr. J. M. Ogle testified: That he was the attending physician and was present in the sickroom about the time that the will was finished and signed by Henson and the witnesses; that he did not remember anything that caused him to think that the testator was not in his right mind. He further testified that Mr. Henson mentioned to him about the medicine being poisoned. That none of the medicine he was giving the patient was poisoned. That the bottle contained creosote and cod liver oil. That the creosote was what he objected to, the witness thought. That he thought the creosote was affecting his bowels. That the "flu" is calculated to weaken a man both in mind and body and break down his resistance. That he had seen people get to the point where they would not care for anything. That the "flu" weakens the system and generally weakens the mind. That some people might have a temperature of 106 degrees and be at themselves, and others might have 103 degrees and be unconscious. It is the temperature evidently that makes the mind wander. That a man of Mr. Henson's build, who weighed over 200 pounds and was short, who during the night had a high temperature and had been making expressions about seeing a mule and saying "little boy be careful, that will fall on you," when there was nothing there, and had gone through the night in that kind of a restless condition, would not be in his right mind the following morning, he thought.

There is much other testimony of the same nature and presenting the question of whether the testator was of sound mind at the time he made the will. But we do not think it necessary to set out any more of such testimony, and conclude from all of such testimony that there existed a question of fact for the jury to pass on, and that the trial court erred in directing a verdict for the contestees.

The evidence showed; That Mrs. Henson married a man named Adkins in February after Henson's death. That when Silas, or Will S. Henson, wrote her on November 1, 1918, having heard of his father's death, she wrote him that his father had died at 2 o'clock Wednesday morning and was buried at 7 o'clock that day, evidently meaning 7 p. m. That he was buried on the same day he died because he was mortifying. That he was in his right mind until about ten minutes before he died. That he wrote his will and provided therein that his six children should share equally in his estate. That she could have the use of the property so long as she was the widow of the testator, but upon her death or subsequent marriage the property should go to his children. She further testified: That she told Silas on his visit to the home shortly after his father's death that such a provision had been made in his father's will as above indicated. That the reason she told this was that she believed such to be the fact, until she went to her lawyer at McKinney and he read the will over to her, and that even then she did not understand that the three older sons had been practically excluded from sharing in their father's estate. That she did not know such to be the case until she went over to Denton to have the will probated.

The trial court doubtless was influenced to give the peremptory instruction by reason of the holding of the Texarkana Court of Civil Appeals on a former appeal of this case, in which the judgment was for the contestants. In that case (256 S. W. 967), the court said:

"It was also shown that, when the testator was stating to Mr. Barnum the terms desired to be inserted in the will concerning his wife, the testator turned towards his wife, who was by his side, holding the pillow that his head rested on, and asked her this question: 'Isn't that

in accordance with or according to our agreement?' The wife answer: 'Yes,' and the clause was written in the will as dictated by the testator. The clear inference from these undisputed facts is that the will reflected the real testamentary intent and purpose of the testator, and that he fully knew of, understood, and assented to its terms. And considering further, as we have, all the evidence concerning the mental condition of the testator, there is no such clear proof, we conclude, of his lack of mental capacity to make a will as would justify sustaining the verdict of the jury. The facts go to show a feebleness and exhaustion physically from the disease, but do not reasonably go to show a continual unconscious or irrational state of the testator's mind. At times he would be wandering and unconscious, and at other times rational; but the irresistible conclusion of clear evidence is that all during the time he was dictating and executing his will the testator was rational and mentally competent to attend to business. An affirmative sufficient fact showing that the testator was not rational and mentally competent during the time he was executing the will is not evidence in the record. Some witnesses undertake to state their opinion concerning his general condition, but it is only an opinion. The delusions and wanderings of mind at times are reasonably explained, and are not significant enough of lack of full mental capacity to give them great weight in this case. The present case differs from the run of cases usually appearing in the books. The incapacity relied on in this case is not claimed to be due to insanity, or senility, or long years of sickness. The incapacity, if any, must rest solely on whether or not the testator, a strong man in middle life stricken with influenza, was continually irrational and wholly unconscious during his last four days of sickness. The evidence is too weak to uphold the conclusion that on Monday, when the will was executed, the testator was irrational and not mentally capacitated to make a will. We also conclude that the evidence is too weak to uphold the verdict of undue influence. The judgment is reversed. and the cause remanded."

We do not know whether the testimony at the former trial was the same as in this trial or not, only a part of the testimony of R. L. Barnum therein being set out. Therefore, in coming to a different conclusion, perhaps, from that reached by the Texarkana Court of Civil Appeals, we do not feel that we necessarily are opposed to that court in our conclusion on this appeal that the trial court's action in giving a peremptory instruction was not proper. We think the testimony in favor of the contestees is sufficient to sustain a verdict of the jury and a judgment of the trial court that the testator was of sound mind at the time he made the will. On the other hand, we think the testimony is sufficient to sustain the contrary conclusion. Warren v. Ellis (Tex. Civ. App.) 137 S. W. 1182, by the Galveston Court of Civil Appeals; Dalton v. Dalton, 233 S. W. 546, by this court; Degenhardt v. Joplin, 239 S. W. 692, by this court.

Therefore the judgment of the trial court is reversed and the cause is remanded.