## OGLESBY et al. v. HARRIS.

### No. 8800.

Court of Civil Appeals of Texas. Austin.
May 31, 1939.

Rehearing Denied June 21, 1939.

Jones & Jones, of Mineola, for appellants.

Collins, Jackson & Snodgrass, Upton, Upton & Baker, and Kerr & Gayer, all of San Angelo, for appellee.

McCLENDON, Chief Justice.

This is a contest of the will of R. A. Weaver, deceased, upon two grounds: (1) Mental incapacity; and (2) undue influence. The contestants were two sisters of the deceased, one of whom died pending the suit and her heirs were made parties. The remaining heirs at law of deceased, consisting of children of two deceased brothers and a deceased sister of deceased, did not join in the contest. The contestee, Harris, an attorney, who was sole beneficiary and independent executor of the will, was not related to deceased. The trial was to a jury upon two special issues submitting each ground of the contest. However, after the jury had retired, the court, upon contestee's motion, withdrew the case from the jury and rendered judgment denying the contest upon the holding

that the evidence was insufficient as a matter of law to support a judgment in favor of contestants upon either of the two asserted grounds. The contestants have appealed.

■ ■ The sufficiency of the evidence to support either ground of the contest presents the controlling issue upon appeal. We have reached the conclusion that the evidence was sufficient to support a fact finding that deceased had not the mental capacity to make a will, and therefore the cause should not have been withdrawn from the jury. We do not regard the evidence sufficient to support a finding of undue influence. We will first consider the issue of mental capacity, outlining, as briefly as we may, the evidence upon that issue, stating it most strongly·in favor of contestants.

The will was executed September 22, 1934, and deceased died October 26, 1934, at the age of 71 years. For some four years prior thereto he had been afflicted with arteriosclerosis, heart disease, and Bright's disease, which had gradually grown worse until about two months before his death when he was confined to his bed in a hotel in San Angelo. About September 26, 1934, he was removed to a hospital and shortly thereafter became insane, and finally violently so. To this extent the evidence is without substantial conflict. Dr. Hinde, a qualified medical expert, who treated deceased from September 4, 1934, until his death, was the main witness for appellants upon the issue of mental capacity. The following, which is a fair resume of his testimony, is copied from appellee's argument in support of his brief:

"Dr. Hinde testified that he had known Weaver from boyhood; first saw him September 4, 1934, and found him suffering from Chronic Bright's disease, heart disease, and arteriosclerosis; that he was about 70 years old and his physical condition was bad; that he remained at the Cactus or Hilton Hotel until about the 26th day of September when he was moved to the Shannon Hospital; that there is a deterioration of the mind in chronic Bright's disease, especially at the end of the disease; that Weaver told him that he had been suffering from chronic Bright's disease for four years that he knew of; that he visited him both at the Cactus Hotel and after he went to the Shannon Hospital and he was progressively getting worse from day to day; that when he first saw him 'he was suffering with a terrible headache and was vomiting considerably'; that his mental condition then was probably worse than it was a day or two later when that condition had subsided; and in response to the question as to what, in his opinion, was the condition of his mind at that time, he testified that he did not think that the mind of anybody with arteriosclerosis, Bright's disease and chronic heart failure would be any stronger than the rest of the body and that the rest of Weaver's body was certainly weak; that his mental condition got worse from the time he first saw him; that on the 22nd of September, 1934, he didn't think Weaver was capable of sound reasoning; that he might have been capable of telling you that he owned some property but he didn't think he would be capable of valuating that property; that he was not able to answer what effect, if any, the insanity of a person had on his feelings towards friends or relatives; that Weaver had a nurse at the hospital and a few days after he entered the hospital he fell out of his bed and got up and was found wandering around the room; that he himself found him on the floor at one time and had moved him to the hospital because, in his opinion, he was a very sick man.

"Upon cross examination, he testified that in the terminal stages of chronic Bright's disease a patient's mind is affected the same as the rest of the body—deterioration of the mind; that when he saw Weaver on September 5, 1934, his mind was weakened to that extent; that he saw him at the hospital afterwards when he was not suffering pain; that he didn't think his mind was perfectly clear then, but that he would carry on conversations and talk to you and answer questions; that Weaver didn't have anything and that he, Dr. Hinde, was trying to get him in the hospital and Weaver told him that he didn't have anything and couldn't go to the hospital; and that Weaver didn't have anything at that time that he knew about."

While there was other testimony strongly supporting the view that deceased was mentally capable to execute the will at the time it was executed, it is not necessary to detail it, since the question before us concerns the sufficiency of the evidence as

a matter of law only to support a finding of mental incapacity.

 That the above testimony was sufficient to support such finding is supported by the holdings in Holt v. Guerguin, Tex. Civ.App., 156 S.W. 581, and Mills v. Kellahin, Tex.Civ.App., 91 S.W.2d 1097, cases presenting close analogies to that at bar.

We state substantially the pertinent evidence upon the issue of undue influence.

Deceased, as stated, was aged and infirm. He had been married, but was divorced many years before his death; and had no children. His nearest relatives were his two sisters and the children of his deceased brothers and sister. Letters over a period of about a year prior to his death showed that his relations with them were cordial and evidenced solicitude for their welfare. They lived some distance from him and his visits to them in recent years had not been frequent. He was in very straightened financial circumstances at the time of his death. He had no money, and his only possession was a one-sixteenth undivided overriding royalty interest in an oil, gas, and other mineral lease upon a quarter section of land in Upton County. This interest was appraised at $200, and the evidence of witnesses testifying to its value at the time the will was executed showed that the appraisal was not an undervaluation. The lease was about to expire at that time and deceased was then making efforts through Harris's firm to have it extended. Harris was an old friend and benefactor of deceased and had represented him in such legal business as he had, which was not large. Harris had made advances for his support and hospitalization during his last illness, and had befriended him in many ways over a long period of years. Several disinterested witnesses, old friends of Weaver, testified to conversations with him in which he had referred to the benefactions of Harris and stated he was going to leave his property to Harris. The will was executed under the following circumstances.

Shortly before the date of execution, Harris went into the room of his law partner Sedberry, and said, "Mr. Weaver wants to write a will and leave his property to me. I don't want to write it." Sedberry said, "Yes, I will write it." Sedberry had no communication with Weaver either before or after he wrote the will regarding it. Although he did consult him regarding renewal of the oil lease. He wrote the will and handed it to Harris. On his way to Weaver's hotel, Harris met an old friend of Weaver and asked him to go to the hotel and witness the will. He consented and the will was witnessed by this party and two others all of whom were old friends of Weaver, and all of whom testified in substance that Harris was not present when the will was signed, and that Weaver stated that he wished his property to go to Harris as that was the only way he had to repay him for his benefactions. Some of the relatives of Weaver were present at his funeral, but there is no evidence of any inquiry on their part regarding his estate. The will was filed for probate July 25, 1935, and was probated September 2, 1935. The contest was not filed until May 14, 1937. Meanwhile Harris had paid the debts of the estate and the lease had become valuable as a result of expenditures by Harris in that regard aggregating some $2,500.

There is no evidence of undue influence other than what may be inferred from the above facts and circumstances. And the only circumstances from which any possible inference of undue influence might be inferred are (1) that the will was drawn under the direction of Harris who was the sole beneficiary thereof, and the legal adviser of Weaver, and (2) that the will was unnatural, in that those related to Weaver by ties of blood were excluded from his bounty in favor of a stranger.

 Ordinarily these circumstances would be sufficient to warrant the inference of undue influence. But the facts that the estate was of practically nominal value, and the beneficiary was an old friend and benefactor of the deceased, to whom the deceased was largely indebted if not in fact legally, at least morally, for assistance rendered in his dire extremity were sufficient, clearly we think, to overcome any inferences of undue influence which would ordinarily be warranted by the bare facts that the will was drawn by or at the request of the beneficiary who was the legal adviser of deceased and not related to him by blood or marriage.

Definitions and the essential elements of mental incapacity and undue influence have been the frequent subject of judicial decision in this and other jurisdictions. A somewhat elaborate restatement of them will be found in the recent opinion of Mr. Associate Justice Critz in Long v. Long, 6 Tex. 379, 125 S.W.2d 1034. We

believe our above conclusions are fairly deducible from the pronouncements of that opinion.

The trial court's judgment is reversed and the cause remanded.

Reversed and remanded.