## CHEESBOROUGH v. CORBETT.

### No. 10973.

Court of Civil Appeals of Texas. Galveston.

Oct. 30, 1941.

Rehearing Denied Nov. 20, 1941.

Byron Economidy, of Galveston, for appellant.

Charles J. Stubbs and Theodore B. Stubbs, both of Galveston, for appellee.

GRAVES, Justice.

This general statement of the nature and result of the suit below—not •contested as such by the appellee, but with a few purely formal interpolations by this court—is taken from the appellant's brief:

"The proponent (appellant) filed his application to probate what he declared to be the will of the late Judge Edward D. May, deceased, in the County Court of Galveston County, Texas, on December 12, 1938. At the same time, he filed the alleged will of the decedent and prayed for the probate thereof, and for letters testamentary.

"Citation was issued and posted as required by law, giving notice to all persons interested in the estate to file their objections to the application for probate.

"On December 21, contestant (appellee) filed his contest.

"On January 30, 1939, a hearing was held on the contest, and proponent introduced testimony, which was taken down by a court stenographer and set out verbatim in the transcript on pages 3C to 3H. Contestant introduced no evidence in behalf of his contest.

"On the 23rd day of February, 1939, the Probate Court denied the contest of contestant, admitted the declared-upon paper as the will of the late Judge E. D. May to probate, and appointed proponent as independent executor of the estate, to which order and judgment of the Court the contestant excepted and was given fifteen days' time within which to file bond in the sum of $250.00, conditioned as required by law.

"Two appeal bonds were filed by the contestant.

"The county clerk transferred all the papers to the district court of Galveston County, Texas, and was by the clerk thereof given a receipt, a copy of which appears in the transcript.

"Before the trial in the district court, the Galveston Orphans' Home was granted leave to intervene, and the same leave was granted to The Sealy-Smith Foundation for the John Sealy Hospital.

"In the petition of intervention of the Galveston Orphans' Home, the grounds of the contest were denied, and the same document so set up by appellant as the will of the late Judge May was sought to be probated. Of the same effect was the petition of intervention of The Sealy-Smith Foundation for the John Sealy Hospital.

"With leave of Court, contestant filed his amended contest, on which he went to trial.

"After the contestant had closed his case and before the proponent offered evidence in rebuttal, proponent moved the Court to instruct the jury to enter a verdict in his favor. This motion was denied and exception taken. The same request was made by proponent after all parties had rested and this request was likewise refused and exceptions taken.

"The cause was submitted to the jury on one special issue, that of testamentary capacity. The jury, after argument and deliberation, answered the special issue that the testator did not have testamentary capacity. After the verdict of the jury was filed and in due time, proponent filed his motion for judgment notwithstanding the verdict, stating that there was no evidence to support the finding of the jury, which motion was overruled and exception taken.

"Final judgment was entered in this cause denying the probate of the paper so severally sued upon as the will of the late Judge E. D. May as against the proponent and the interveners. The judgment specifically provided that no costs were adjudged against the proponent and that his attorney, Byron Economidy, Esq., was awarded $1500.00 as attorney's fees payable out of the estate of E. D. May, deceased. Proponent and the two interveners duly and timely excepted in open court and gave notice of appeal to the Court of Civil Appeals for the First Supreme Judicial District of Texas, at Galveston. Contestant appealed, excepting to that portion of the judgment awarding attorney's fees in favor of the proponent, and gave notice of appeal to the Court of Civil Appeals for the First Supreme Judicial District of Texas, at Galveston.

"Thereafter, proponent (appellant) alone, perfected his appeal by filing his bond on June 17, 1939."

The two intervenors below failed to perfect their appeals, but the appellee did per-

fect his against the allowance of the $1,500 attorney's fee to the appellant; hence the issues here are defined accordingly.

Both sides have presented preliminary motions to this court, which have been considered along with the cause, appellee's being for the dismissal of appellant, Cheesborough's, sole appeal, on the ground that it had become moot because of the failure of the two intervenors below, who were the sole beneficiaries under the purported will, to perfect their own appeals herein; appellant's being for the striking-out of appellee's statement under his answer to appellant's propositions 1 and 2, on the ground that it presented arguments and conclusions alone, instead of the facts required by the statutes and the court rules.

■ Both motions are overruled, appellant's on the conclusion that it is without merit, since appellee's statement—while argumentative in character—is not devoid of such accompanying recitation of facts as our procedure permits; the appellee's upon the construction that, under Chapter 12 of our Revised Statutes relating to "Administration Under A Will", and especially Articles 3433 to 3437 thereof, inclusive, applying to states-of-fact like that here existing, where a will has been first probated in a county court and a contest thereof by appeal carried to the district court, the executor named in the challenged will was the only necessary party to the contest either in the county or the district court, and that the two named intervenors here, although the designated beneficiaries of the entire estate, were represented through such statutory official. Bevill v. Rosenfield, Tex.Civ. App., 113 S.W.2d 340, and authorities there cited; Kramer v. Sommers, Tex.Civ.App., 93 S.W.2d 460; Lyons-Thomas Hardware Co. v. Perry Stove Mfg. Co., 88 Tex. 468, 27 S.W. 100.

It, therefore, became immaterial that the two intervening beneficiaries—so named as being entitled to the entire estate—chose to make common cause with the designated executor in battling throughout the district court—they not having intervened in the county court—for the probate of the paper, but left the fight to him alone in the appellate court.

This court heretofore passed consideration of this appeal to await a decision of the Supreme Court of Texas, in Gumm v. Chalmers, Tex.Civ.App., 127 S.W.2d 942, which had granted a writ-of-error looking to a review of this court's judgment therein; that court, however, by opinion on that review, reported under the style of Chalmers v. Gumm, in 154 S.W.2d 640, entered July 9 of 1941, motion for rehearing therein having been overruled October 15 of 1941, in effect held, as this court interprets it, that appellant's objection, under his proposition 4 on this appeal—that this appellee's pleading herein that "he is a son of decedent's, E. D. May's sister, and that he is the decedent's nephew and next of kin and heir at law", was insufficient to entitle him to contest such will—came too late because it was first presented on appeal, when it should have been raised in limine and before issue was joined in the trial court on the merits of the case.

■ In other words, that holding of the Supreme Court, although applied to the evidence of a contestant's claim to an interest in a decedent's estate, is here held to equally apply to the pleading of such an interest; especially, as applicable to the case at bar, since the undisputed evidence in this instance showed both that this appellant made no objection whatever to the sufficiency of the appellee's quoted pleading until he attempted to so raise it upon this appeal, and full proof was made without contradiction below that there was no surviving child, widow, parent, brother, or sister, of this deceased, E. D. May; wherefore, there could have been no support for appellant's fourth proposition.

These conclusions reduce the major questions on the appeal, it is thought, to these three:

(1) Whether the evidence was sufficient —as against the particular attacks made upon it—to support the jury's finding that this deceased did not have testamentary capacity at the time he executed the writing herein offered for probate;

(2) Whether error—prejudicial to appellant—was committed in any of the challenged rulings of the trial court upon the admission and exclusion of testimony;

(3) Whether the trial court's allowance of a $1,500 fee, payable out of the decedent's estate for the benefit of his attorney, was shown to be properly within the court's discretion.

(1) The first of these queries answers itself, when attending facts are stated; initially, the appellant simply and flatly asserted, as to the entire testimony of this single jury issue, that it constituted no evidence in

support of the verdict returned, in these two propositions:

No. 1. "Judge E. D. May, who departed this life December 9, 1938, * * * had, as a matter of law, sufficient testamentary capacity to execute his last will and testament; * * *"

No. 2. "Judge E. D. May, at the time of the writing of his will, as a matter of law, was not laboring under any insane delusions * * *."

In such circumstances, that in the aggregate and in sum being in effect the major attack made upon the support for the jury's findings, the well-settled rule of law applied is that, as against a proponent of a will who by statute had the burden of establishing testamentary capacity in the testator, all the contestant thereof need do is to produce evidence sufficient to raise an issue for the jury over whether or not such capacity existed at the very time of making the will; that is, the test is whether or not the evidence was insufficient to raise that issue or warrant its submission to the jury, as these authorities make manifest: Gumm v. Chalmers, Tex.Civ.App., 127 S.W.2d 942; Love v. Eastham, Tex.Civ.App., 132 S.W.2d 292; Stone v. Grainger, Tex.Civ.App., 66 S.W.2d 484; Breeding v. Naler, Tex.Civ. App., 120 S.W.2d 888; Rodgers v. Fleming, Tex.Com.App., 3 S.W.2d 77; In re Finkelstein's Estate, Tex.Civ.App., 61 S.W.2d 590; Johnson v. Moody, Tex.Civ.App., 104 S.W. 2d 583; Morris v. Morris, Tex.Com.App., 279 S.W. 806; Reinhardt v. Nehring, Tex. Com.App., 291 S.W. 873; Campbell v. Campbell, Tex.Civ.App., 215 S.W. 134; Mills v. Kellahin, Tex.Civ.App., 91 S.W.2d 1097; Degenhardt v. Joplin, Tex.Civ.App., 239 S.W. 692; Henson v. Adkins, Tex.Civ. App., 290 S.W. 231; Warren v. Ellis, Tex. Civ.App., 137 S.W. 1182; Vance v. Upson, 66 Tex. 476, 477, 1 S.W. 179; Prather v. McClelland, 76 Tex. 574, 13 S.W. 543; Christner v. Mayer, Tex.Civ.App., 123 S.W. 2d 715; Oglesby v. Harris, Tex.Civ.App., 130 S.W.2d 449.

When gauged by that rule, this testimony so overwhelmingly supports the jury's findings that extended discussion of the question is deemed unnecessary; instead, there is quoted with approval this summary from the appellee's brief of his main witnesses' testimony on that issue, as well as the conditions attending the actual execution of the will:

(1) "The witnesses to testify on behalf of appellee were those who had been most closely associated with Eddie May during his lifetime. Some of them were men who had known him since boyhood. Some were relatives in whose homes he had visited, and who knew him intimately for a long time. Others were those who had full opportunity to observe him in the long hours he would spend day in and day out in the City Park, in the Interurban Station, on the streets, and on the beach. The unanimous opinion of these witnesses was that Eddie May's mind was unsound, and that, although it was bad before his wife died in February, 1936, it was very much worse after his wife's death. His will was written seven months after his wife died.

"About six weeks after Mrs. May's death, Dr. Parrish was in his office. The telephone rang; it was Eddie May. He cursed Dr. Parrish very violently and accused him of poisoning his wife.

"A couple of weeks later Dr. Parrish met Eddie May in front of the interurban station. He looked at the doctor rather fixedly. 'I asked him if he remembered me and he said he didn't.' Dr. Parrish then told him who he was and asked him what he was going to do about the bill and Eddie May in a very excited manner commenced to curse the doctor and threatened him with bodily harm. Dr. Parrish has had mental cases in his practice and treated them. Eddie May was, in Dr. Parrish's opinion, 'definitely unsound'.

"Mrs. William Johnson, who had been closely associated with Eddie and Mrs. May, said he was of unsound mind, and that in her opinion his mind had always been deranged. Miss Rose Martingano said he was of unsound mind and that he got very much worse after his wife's death. Mr. H. Diamond, in whose house Eddie and Maggie had lived four different times, held the opinion that he didn't have a sound mind. Mr. J. M. Burke was of the opinion that he was of unsound mind at times and that after his wife's death that condition got very much worse. Mr. Caso, who had known Eddie May for many years and in whose office Eddie May used to hang out regularly, testified: 'I think he was of unsound mind on account of the way he acted in the latter years.' 'Q. Did his mind change for the worse after his wife's death? A. Yes. yes, he got uncontrollable after she died.' 'He never recovered from that.' Mr. Henckel, who had known Eddie May since he

was a little boy, testified that Eddie May's mind was pretty shaky, especially after his wife died.

"Mr. Van Benthusen considered that Eddie May was not of sound mind, and that he got worse after his wife's death. Mr. William Neal, who had known Eddie May since about 1883, held the opinion that Eddie May was of unsound mind part of the time, and by unsound mind the witness meant 'one that hasn't got all his parts here, he is crazy.' (Witness pointed to his head). Mr. Dameron said Eddie May was of unsound mind, and got worse after his wife's death. Mr. Paul J. Klaus, who was a schoolmate of Ed May's and who was a regular associate of his in the interurban station, said Eddie's mind was unsound, and got worse after his wife's death. Mr. Charles Lawson, who had known Eddie May for sixty years, testified: 'My opinion is he was crazy.' 'He was that way before his wife died and after her death he was worse.'

"Mr. T. D. Gilbert, who had gone to school with Eddie May and known him practically all his life, testified that he was of unsound mind and that in the last three or four years of his life he got worse. Mr. Manning testified: 'The way he acted all the time I thought he was crazy.' Mrs. Kate Gundermann, the elder, made up her mind that Eddie May was of unsound mind about twenty years ago; and that his mind was affected after his wife died and he went absolutely insane. Mr. Alvin E. Workman was of the opinion that he did not have all that was coming to him, and Mr. W. L. Ratisseau considered him of unsound mind.

"Mr. John W. Young held the opinion that 'he was crazy and should have been locked up.' Mr. Young arrived at that opinion in 1934 and his opinion got stronger the longer Eddie May lived. Mr. M. E. Shay thought that Ed May was 'mentally unbalanced', and that if he had lived another year he would have been declared N. C. M. and confined.' Mr. Shay formed the opinion that Eddie May was of unsound mind about 1926; 'that was the beginning, and he slipped all the way after his wife's death.' Mr. F. C. Allen described Eddie May as 'unbalanced'. 'I have seen lots of people unbalanced but he was as bad as I ever have seen loose.' "

(2) "On September 22, 1936, about seven months after his wife's death, when his mind had gone from bad to worse, 'Judge' May selected a saloon ('The Queen Bar') at 27th and Postoffice, in the heart of Galveston's notorious red-light district, as the setting and occasion for writing his will. He chose two highly respectable institutions (which, while no doubt performing laudable social services in the community which he so bitterly condemned, had never permitted him to serve on the boards of directors thereof, to which he had not contributed in his lifetime, and which did not need the money), as beneficiaries. He named as executor E. R. Cheesborough.

"Of all the people that he might have chosen as attesting witnesses to come into open court after his death, as the friends to whom he had entrusted the solemn task of proving up his will, he selected as attesting witnesses to his will 'Big Julia' Van Ness, who claimed her constitutional right of declining to state her occupation, and Giulio Meucci, a denizen of 27o1 Postoffice, whom appellant did not place on the witness stand.

"The so-called will was scribbled on a piece of bartender's scratch paper, in pencil, in a hardly legible hand. The record fails to show where this paper was found, after his death. It was not in his safety deposit box."

Subsidiarily, by his succeeding proposition No. 17, appellant contends that the jury's finding of the lack of testamentary capacity "is clearly against the great weight and preponderance of the evidence, is manifestly wrong and unjust, and in all fairness should not be permitted to stand."

■ For the reasons already given, this court is unable to see eye-to-eye with this view, concluding rather from its careful review of the evidence that it strongly preponderates in favor of the verdict, wherefore, in the exercise of its exclusive province, it must sustain the verdict on the finding that it is not so against the great weight and preponderance of the evidence as to be manifestly wrong, but, on the other hand, is amply supported thereby.

■ (2) As concerns these presentments, it is not thought reversible error is shown in any of the challenged rulings as to testimony; the first of them complains of the refusal of the court to permit appellant himself, without having first introduced a certified copy of his own testimony in the county court, to orally testify in the district court to an entirely new set of questions and answers, extending his testimony far beyond that given by him in the county court. That procedure ran counter to R.S. Article 3351, Vernon's Ann.

948

Civ.St. Art. 3351, which the trial court properly held.

As to the second one, to the purport that testimony at the instance of contestant to the effect that the decedent had perverted sexual impulses was inadmissible as having no probative force on the issue of whether or not he had testamentary capacity, the decided cases, like Beadle v. McCrabb, Tex.Civ.App., 199 S.W. 355, seem to recognize that such impulses as this testimony indicated did have a weakening effect upon the addict's mind—hence it may not be said that it had no tendency to show the existence of mental disorder.

Under his propositions 9, 11, and 13 appellant criticises, on the ground of its immateriality in each instance, the admission of testimony relating to the source of testator's estate, as well as of a copy of the will of the late John Sealy—along with a certified copy by the clerk of the county court of Galveston County of an extract from the inventory, appraisal, and list of claims on file in the matter of the estate of Mr. Sealy, as shown in that court's Probate Minutes, Book No. 80.

A sufficient reply to these objections is that an inquiry into the source and quantum of a testator's estate is quite generally held to be material where the inquiry, as here, turns in part at least upon whether the propounded instrument tendered for probate as his will is natural or unnatural (44 Tex.Jur., at page 614); while the will, papers, and proceedings as to the John Sealy estate had as their predicate for materiality and admission into these proceedings—in the undisputed showing appearing in this record—that appellant's counsel opened up the subject of the financial status of the John Sealy Hospital by inviting this appellee to investigate the financial condition of either the Sealy and Smith Foundation, or the Galveston Orphans Home; whereas, as to the detail that the certified copy was not a complete inventory, it appears further that the trial court offered appellant the privilege of introducing the whole proceeding. If, therefore, these rulings were erroneous, appellant invited them and cannot complain.

Appellant's criticisms of the court's charge, presented by its propositions 14 to 16, inclusive, questioning the court's definition of "testamentary capacity", its failure to declare that the "burden of proof on the issue of insane delusions should be on the contestant and not on the proponent", and its neglecting to submit "separately to the jury for a fact-finding each ground contended to be an insane delusion" are all overruled on the holding that—there being only one fact issue herein raised under the pleadings and evidence —to-wit, whether E. D. May possessed testamentary capacity at the time of executing the writing here involved, and the court having clearly submitted it to the jury with a thoroughly approved definition of "testamentary capacity" appended, there was left no merit in those complaints. Rodgers v. Fleming, Tex.Com.App., 3 S. W.2d 77; Morris v. Morris, Tex.Com.App., 279 S.W. 806; Prather v. McClelland, 76 Tex. 574, 13 S.W. 543; Mills v. Kellahin, Tex.Civ.App., 91 S.W.2d 1097; Breeding v. Naler, Tex.Civ.App., 120 S.W.2d 888, 891; Lanham v. Lanham, 62 Tex.Civ. App. 431, 146 S.W. 635, 640.

Appellant's propositions 6, 7, 8, 10, and 12, challenge, as improper arguments, comments of appellee's counsel before the jury on: (a) Appellant's "failure to place on the witness-stand in his behalf a witness who was subpoenaed by contestant himself to give testimony in behalf of contestant"; (b) in effect that, had the testator "really wanted to do some good charities, he could have found enough poor folks in his own family, in the Gundermanns, the Ratisseaus, and the Corbetts", to name as his beneficiaries rather than the two charitable corporations, etc.; (c) in suggesting to the jury that the witness, Joe Burk, first reached the conclusion that testator was of unsound mind after "the father of testator had talked to Joe Burk", etc.; (d) in telling the jury, after the court had ruled the size of testator's estate vel non to be an immaterial issue, this: "Eddie May inherited something from his parents, he inherited something from them and he might have sold some property and turned the cash into bonds but there isn't any evidence in the record that he improved his family estate at all. As far as this record is concerned there is no showing that he had a cent more than his good father, Dennie May, and his good mother, Annie May, that he called of unsound mind, left him"; (e) in remarking to the jury, after he had secured admission into this evidence of the last will and testament of the late John Sealy, as follows: "Well, John Sealy doesn't cut out his kinfolks. When John Sealy sat down to make his will, he

remembered his aunts, and cousins, and second cousins generously. Ten thousand dollars here, ten thousand dollars there, and so on. He remembered his cousin, George Ewalt, with ten thousand dollars, and George Sealy with fifty thousand dollars. He scattered around about one hundred thousand dollars. That is enough to leave a man's kinfolks, but John Sealy was a man who was charitable in his life and remembered his own kinfolks in his will. That was fine."

None of these questioned arguments— in the attending circumstances—are thought to have entailed prejudicial error; indeed, when the settings are consider, it is not perceived that any of them were in the category of improper comment upon conditions that were developed, and certainly none were inflammatory in character; not all of them were even objected to when made, and of those that were not, it does not appear, had challenge been then entered, that the objected to features would not have been removed either by the court or opposing counsel.

■ The trial—having been a tripartite one—took a very wide range, and many domains of outlying evidence beyond the pale of materiality were explored; the first of these criticisms challenges appellee's attorney's comment upon appellant's failure to put Giulio Meucci, one of the two attesting witnesses to the alleged will, on the witness stand after he had put the other one, Julia Van Ness, on, subsequent to the closing by appellee of his cause. Appellant did not object to this argument when made, there had been no agreement between the parties dispensing with the necessity of making timely objections, and the entire controversy over who should put the attesting witnesses on the stand appears to have been thrashed back and forth before the jury for some three weeks. In these circumstances, it is held that appellee was entitled so to draw an adverse inference from the fact that one of the two attesting witnesses was in attendance upon the court, and had not been called to testify by the party propounding the instrument he was alleged to have subscribed. Jones v. Steinle, Tex.Civ.App., 15 S.W.2d 164; Elwell v. Universalist General Convention, 76 Tex. 514, 521, 13 S.W. 552.

■ Instead of being inflammatory, as appellant contends, appellee's attorney's statement that the alleged testator here could have found enough poor folks in his own family, had he really wanted to do some good charities in disposing of his entire estate, to give it to them rather than to the corporate beneficiaries he did name, is thought to have constituted not only a legitimate argument on a very material issue—that is, testamentary capacity, or capacity to understand and appreciate the natural claims upon his bounty of those who had been good to the testator and to whom he was bound by ties of blood—as well as to have been clearly invited by the appellant himself—in adducing the stated evidence touching the financial status of the appellee tending to show that he was already well provided for; at any rate, it is held that no injustice resulted to the appellant therefrom. Morris v. Morris, Tex. Com.App., 279 S.W. 806; Rudersdorf v. Bowers, Tex.Civ.App., 112 S.W.2d 784; Stubbs v. Houston, 33 Ala. 555; In re Williams' Estate, 52 Mont. 192, 156 P. 1087, Ann.Cas. 1917E, 126.

■ The counsel's comment to the effect that the witness, Joe Burk, first concluded that testator was of unsound mind after testator's father had talked with Joe Burk, attacked as having been made after the court had excluded evidence of what the father had said, is shown by the trial court's qualification to the bill of exceptions reflecting it, not to have been objected or excepted to at the time made, or during the trial; further, the purport of such argument evidently was to fix the beginning of the decedent's shown antagonism toward his own family as having been in 1905 or earlier, as to which there seems to have been plenty of evidence; wherefore, in any event, such comment was harmless.

■ Nor was it improper for appellee's counsel to further undertake to rebut contentions of opposing counsel that the decedent "had business ability", by attempting in reply to point out the failure of the record to show that he had in any way improved or increased his ancestral estate, Stubbs v. Houston, 33 Ala. 555; In re Williams' Estate, 52 Mont. 192, 156 P. 1087, Ann.Cas. 1917E, 126.

■ Finally, on this subject, it was not improper for the appellee to bring out the fact, and for his attorney to comment on it in response to opposing counsel's having opened up the status of the John Sealy

Hospital, as discussed supra, the related disclosure that John Sealy had not left his entire estate to charity, but had left many large legacies to his relatives and friends.

██ (3) The appellee's cross-assignment against the trial court's allowance of the $1,500 as an attorney's fee to the appellant for the benefit of his counsel is sustained, upon these considerations:

"Appellant, E. R. Cheesborough, having failed to plead, prove, or offer any evidence on the trial of the cause, on the subject of attorney's fees, and having made no claim therefor until several days after the conclusion of the trial, it was error for the court to award E. R. Cheesborough $1500.00 for attorney's fees.

"Both the beneficiaries under the purported will of E. D. May, deceased, having become parties to the litigation and being represented through the trial by able counsel of their own selection, it was error for the court to award $1500.00 attorney's fees in the absence of pleading and proof of the necessity and propriety of having a separate attorney for the executor and in the absence of any evidence as to the reasonableness of said fee."

The quoted facts being undisputed, that ruling is thought to find support in these authorities: Huff v. Huff, 132 Tex. 540, 124 S.W.2d 327; Connecticut General Life Ins. Co. v. Bertrand, Tex.Com.App., 65 S.W.2d 279; McCannon v. McCannon, Tex.Civ.App., 2 S.W.2d 942.

██ However, since no attack was made below upon the good faith of either appellant or his attorney, and since, under the holding in the cited Huff case by our Supreme Court, a reasonable attorney's fee would be recoverable by him under proper pleading and proof thereof, no rendition of the cause for such attorney's fee may be made here; but it should be remanded for a retrial upon that issue alone.

These conclusions upon the whole case, therefore, require that the trial court's judgment be in all things affirmed, except alone as to the allowance of a reasonable attorney's fee to the appellant in prosecuting his right to offer the alleged will for probate, and that as to that one issue the cause be remanded for another trial below. It will be so ordered.

Affirmed in part; reversed and remanded in part.